**UNITED STATES of America, Plaintiff,**

v.

**Robyn K. OCHOA, Kevin M. Alley, Defendants.**

**Nos. 97–10108–01, 97–10108–02.**

United States District Court,
D. Kansas.

April 6, 1998.

1008

Daniel E. Monnat, Monnat & Spurrier, Chtr., Wichita, KS, G. Craig Robinson, Wichita, KS, Frank J. Ragen, San Diego, CA, for Robyn K. Ochoa.

Cyd K. Gilman, Office of Federal Public Defender, Wichita, KS, for Kevin M. Alley.

Penelope Y. Cassell, Montie R. Deer, Office of U.S. Atty., Wichita, KS, for U.S.

### MEMORANDUM ORDER

MARTEN, District Judge.

On August 17, 1997, at approximately 1:30 p.m., defendants Robyn K. Ochoa and Kevin M. Alley were stopped by Kansas State Troopers Jay Rule and Richard Jimerson while traveling eastbound on Interstate 70. Ochoa was driving a Gold Lincoln Continental and Alley was a passenger in the Lincoln. Marijuana was discovered in the trunk of the Lincoln and the defendants were arrested.

Both Ochoa and Alley moved to suppress the evidence seized from the trunk of the Lincoln. They also filed various pretrial discovery and in limine motions. The court held a hearing on February 11, 1998, and issued an order on February 19, 1998, suppressing the evidence. This opinion explains the ruling.

I. The Motions to Suppress.

A. Facts.

The court finds the following facts, based upon the testimony and other evidence admitted at the hearing. Additional findings of fact are made in the analysis, below.

Troopers Rule and Jimerson were stopped on the eastbound shoulder of Interstate 70 near the Colorado border having just completed a traffic stop when two eastbound vehicles passed them. Ochoa was driving the first car, a gold Lincoln. Alley was a passenger in the Lincoln. A Toyota was following the Lincoln too closely and the officers could not see a tag on the Toyota. The officers testified traffic was light,[1] which led them to believe the two vehicles were traveling together.

The officers followed and observed the vehicles for several miles. The officers pulled up behind the Toyota and observed that it had a temporary tag, but they could not read the expiration date. Instead of stopping the Toyota, they pulled alongside it in the passing lane to observe the occupants.

The officers traveled beside the Toyota for approximately 15 seconds. Officer Rule testified the patrol car had no lights on top of it and a person looking at it in the rearview mirror might not recognize it was a highway patrol car. Officer Jimerson testified it was marked on the sides and the trunk. The court finds the vehicle was readily identifiable as a police car.

Officer Rule then observed the Lincoln briefly drift one and a half to two feet onto the shoulder and called this to Officer Jimerson's attention. The Lincoln promptly returned to its proper lane of travel. Rule testified that a driver can drift briefly if distracted, citing as examples a driver pouring a cup of coffee or changing a tape. The officers pulled forward to see if the driver of the Lincoln was wearing her seat belt, which she was. The officers then backed off the Lincoln to the Toyota, where Jimerson signaled to the Toyota to pull over. Rule pulled in behind the Lincoln and activated the emergency lights to stop it.

The officers testified the Toyota was stopped for following too closely and to check the expiration date on the temporary tag. They stopped the Lincoln for failure to maintain a single lane. Neither vehicle was speeding.

Trooper Rule went up to the Lincoln. Ochoa produced a valid Rhode Island driver's license and a rental agreement for the car. The car had been rented by Alley in Las Vegas on August 16, 1997, and was to be returned there on August 22, 1997, according to the government, or August 23, according to Alley.[2] Trooper Rule remembered the rental papers showing Alley with a permanent address in Rhode Island and a Las Vegas address at Econo–Lodge. He asked Ochoa if they were traveling with the Toyota and Ochoa said yes.

---

1. The court reviewed the video tape of the stop, which was admitted into evidence. The traffic was somewhat busier than light, in the court's view, and the traffic appeared to travel in clusters.

2. The government failed to produce the rental agreement at the suppression hearing.

Trooper Rule asked Ochoa if she was getting sleepy. According to Rule's report, Ochoa said no and explained that she was trading driving with Alley, who appeared to be asleep in the back seat.[3] At the hearing, the government argued that Ochoa actually said "I'm a little tired," relying on a transcript prepared by a law enforcement officer from the videotape of the stop. The court viewed the videotape with and without the transcript and finds it impossible to determine what was said from the videotape. The version Trooper Rule put in his report, i.e., that the driver responded she was not sleepy, is adopted by the court as that is the response Rule would have relied upon during the stop.

Trooper Rule asked Ochoa about their travel plans. Ochoa said they had been living in Las Vegas for two months and were moving back to Rhode Island. Alley had rented the car in Las Vegas for the move. She was driving because Alley was tired. Rule returned to the patrol car with Ochoa's papers and began writing a warning citation for failure to maintain a single lane.

Meanwhile, Trooper Jimerson had approached the Toyota, which was being driven by Carlos Mendez and was registered to Alley. A passenger was in the car with Mendez. Mendez told Jimerson they were going to Boston to visit some girls. Jimerson did not ask Mendez at that time if he (Mendez) was traveling with the Lincoln.

Trooper Jimerson recognized Mendez because he had issued him a warning ticket for speeding a few weeks earlier. Jimerson testified he thought at the time of the earlier stop the driver was serving as an escort for a drug courier in a van. However, Jimerson said no drugs were located in the earlier stop and the police were unable to justify a stop of the van. Jimerson returned to the patrol car to write Mendez a warning citation for following too closely.

The troopers compared notes in the patrol car. The officers noted the Toyota was registered to Alley, who had rented the Lincoln. Jimerson told Rule that the occupants of the Toyota had not mentioned they were travel-

ing with the Lincoln and said they were going to Boston. Jimerson mentioned that he recognized Mendez and thought he was working as an escort for drug couriers. The officers joked about how much marijuana they would find in the Lincoln. At the hearing, Rule testified that at the time, he planned to do whatever he could to get into the trunk of the Lincoln. Trooper Rule was not aware at the time of the stop that Boston and Rhode Island are 40 miles apart, an inference the court draws from his testimony at the suppression hearing that the 40 mile distance "does not sound right," that he thought they were farther apart.

Trooper Rule returned to the Lincoln and leaned on the car. He returned Ochoa's papers and gave her a copy of the warning citation. Rule stepped back from the car and told Ochoa to have a good trip, immediately moved back toward the car, and asked Ochoa if she would answer a few questions. Before Ochoa could respond, Rule was leaning on the car again. Ochoa said, "Sure." Trooper Rule testified it was unsafe to drive away with someone leaning on your car. Rule also testified he did not intend to let Ochoa leave. Rule asked Ochoa if she was hauling anything illegal, such as guns, drugs, or large amounts of money. Ochoa said, "no." Rule then asked several times if he could search the trunk. Ochoa asked why, but never consented to the search.

At this point, Rule explained that he was going to work a drug dog on the vehicle because of inconsistent answers provided by the occupants of the two cars and left for a few minutes.

Meanwhile, Jimerson had returned to the Toyota. He asked Mendez if they were traveling with the Lincoln and Mendez told him they were. He also told the trooper that the owner of the Toyota was in the Lincoln.

Trooper Rule asked Ochoa and Alley to step out of the Lincoln. As they got out, Rule took the keys from Ochoa. Rule and Jimerson then worked a drug dog on the Lincoln and the dog alerted on the trunk. The troopers found approximately 222

---

**3.** Rule testified that Alley "was acting like he was asleep," but cited no evidence in support other than that Alley was not looking up to see what was going on.

pounds of marijuana in the trunk and the defendants were arrested.

## B. Analysis.

■■■ The government bears the burden of proof to justify warrantless searches and seizures. *United States v. Maestas,* 2 F.3d 1485, 1491 (10th Cir.1993). Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention quite brief. *United States v. Gregory,* 79 F.3d 973, 977 (10th Cir.1996). The reasonableness of the stop is evaluated under a two-pronged test: (1) was the stop justified at its inception, and (2) was it reasonably related in scope to the circumstances which justified the stop in the first place. *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■■■ When evaluating the constitutionality of police conduct in what begins as a warrantless *Terry* stop, this court must conduct a step-by-step examination of the encounter to determine whether the government had the required amount of reasonable suspicion, probable cause, or consent to support the officers' actions. *United States v. Lee,* 73 F.3d 1034, 1038 (10th Cir.1996).

### 1. The Initial Stop.

The defendants challenged the initial stop of the Lincoln, relying on *Gregory, supra.* The government concedes that both defendants had standing to challenge the initial stop and any subsequent detentions.

The facts supporting the stop are:

(1) two cars traveling east on Interstate 70 at a lawful speed;

(2) the rear car is following the front car too closely;

(3) the rear car has a temporary tag in the rear window, the angle such that the expiration date cannot be read;

(4) as the patrol car catches up to the rear car, it pulls into the passing lane and drives alongside the rear car;

(5) the front car momentarily drifts one and one-half to two feet onto the right shoul-

der of the road and then gets right back into its lane; it has not drifted previously, nor does it drift again; and,

(6) the patrol car moves up in the passing lane and sees the driver shows no sign of sleepiness and is wearing a seat belt. The patrol car then drops back between the two cars and pulls both cars over.

In this case, the court confronts a situation in which the Ochoa vehicle initially had done nothing wrong, the troopers seemingly had decided to try to find some way to justify pulling the Ochoa vehicle over anyway, the patrol car likely was a significant factor in causing the momentary drift one and a half to two feet partially onto the shoulder, and that resulted in the stop, which ultimately resulted in the seizure of the marijuana.

The government relies on two justifications for the initial stop of the Ochoa vehicle: (1) crossing onto the shoulder was a violation of the law; and (2) Rule was concerned that Ochoa may be sleepy or otherwise impaired.

*Gregory* held, under the facts of that case, that a single crossing onto the shoulder was not a violation of Utah law requiring vehicles to "operate as nearly as practical entirely within a single lane" and could not justify a stop. *Id.,* 79 F.3d at 978 (citing Utah Code Ann. § 41-6-61(1)). In *United States v. Dunn,* 133 F.3d 933, 1998 WL 8227 (10th Cir.1998) (slip copy), a subsequent unpublished opinion addressing a Kansas statute virtually identical to the Utah statute, the Tenth Circuit held *Gregory* did not announce a bright-line rule. Instead, it held that whether a single crossing onto the shoulder justified a traffic stop was a fact specific inquiry, depending on such factors as the weather, traffic, and road conditions. *Dunn,* 133 F.3d 933, 1998 WL 8227 (applying K.S.A. § 8–1522, which also provides that "a vehicle shall be driven as nearly as practicable entirely within a single lane").

■■■ There was no testimony from the government regarding the weather or road conditions. The evidence regarding traffic conditions was inconsistent—the officers testified traffic was light while the tape showed what the court considers moderate traffic

traveling in clusters. When Ochoa briefly drifted onto the shoulder, another vehicle was following her too closely with a patrol car maintaining a position directly beside it. A reasonable driver might have been distracted by the commotion and looked to see what was going on, briefly drifting partially onto the shoulder. In fact, in view of Trooper Rule's testimony which reflects a clear intent to find some reason to pull over both cars, the court must consider the impact of the officers positioning their vehicle beside the Toyota, which may have startled Ochoa into crossing onto the shoulder or committing some other minor traffic violation. The court finds under the facts of this case that Ochoa's single crossing onto the shoulder was not a violation of Kansas law.[4]

With regard to the officers' concerns about sleepiness or other impairments, *Gregory* rejected similar explanations that a stop was made to investigate impairment of the driver due to intoxication or sleepiness. *Gregory* rejected the intoxication justification because the officer testified he did not plan to conduct a sobriety test when he stopped the car and in fact did not do so. Thus, the officer must have been satisfied the movement to the right shoulder did not give rise to reasonable suspicion the driver was intoxicated. The court rejected the sleepiness justification because the officer did not testify to any other evidence indicating the driver might be sleepy or impaired, noting that "only if a driver is extremely fatigued can the condition constitute a danger to public safety." *Gregory*, 79 F.3d at 978.

■ Here, neither officer testified they were concerned Ochoa might be intoxicated and they did not conduct a sobriety test. The officers followed Ochoa for several miles and testified to no indications of sleepiness, other than the single brief drifting partially onto the shoulder. Before stopping her, they pulled alongside her vehicle to see if she was wearing her seat belt. Neither officer testified that she appeared sleepy or otherwise impaired at that time. The court finds there was no evidence that Ochoa was fatigued sufficient to justify a safety stop.

The evidence also indicates that the officers were not actually concerned that Ochoa might be sleepy. Before observing Ochoa drift partially onto the shoulder, the officers' conclusion that the Ochoa and Mendez vehicles were traveling together indicates they had already decided they wanted to stop the Lincoln, if possible. After the vehicle was stopped, Rule asked Ochoa if she was tired, but he either failed to correctly record her answer in the report he prepared a short time after the stop, or he correctly recorded her answer in the report and the government now claims the report is erroneous. It is impossible to glean an accurate response from the tape. The court concludes the officers were not concerned that Ochoa was operating the vehicle while sleepy or impaired.

Both of the government's justifications for the initial stop fail. Therefore, the evidence seized must be suppressed unless the government can meet the heavy burden of showing the primary taint of the illegal stop was purged so that a subsequent consent was in fact voluntary. *Gregory*, 79 F.3d at 979. The government does not argue a subsequent consent justified the search. In any event, where Trooper Rule testified that it would have been unsafe for Ochoa to drive away and where he testified she was not free to go, the court finds Ochoa's consent to answer additional questions was not in fact voluntary.

Accordingly, the motion to suppress is granted because there was no valid justification for the initial stop and no subsequent

---

4. This is not a matter of a pretextual stop, which is no longer an issue in these types of cases. *See Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Botero–Ospina*, 71 F.3d 783 (10th Cir.1995) (en banc). It is a question of whether there was, in fact, a violation. Here the court finds the troopers caused or contributed to causing the drift, which, under the circumstances, does not constitute a violation. The troopers had decided the Ochoa and Mendez vehicles were traveling together as the troopers watched them drive by. Although Trooper Rule testified he and Trooper Jimerson did not decide to pull over the Ochoa vehicle until the shoulder drift, their actions in not pulling over the Mendez vehicle immediately, as well as their instantaneous decision to pull over the Ochoa vehicle, although she appeared to be fine, clearly indicate their desire to find a way to pull over both vehicles.

consent after a break in the illegal detention. It is not necessary to consider whether the officers subsequently developed reasonable suspicion during the illegal detention, as all such evidence would be fruit of the poisonous tree. However, the court will address the government's contention that, assuming the validity of the initial stop, the officers had reasonable suspicion to detain the defendants for questioning regarding contraband and in order to subject the vehicle to a dog sniff.

2. Detention After Completing the Purpose of the Initial Stop.

■ Ochoa and Alley both challenge their continued detention for questioning and a dog sniff after Rule returned Ochoa's papers and issued a warning citation for crossing onto the shoulder.

> During a routine traffic stop, the detaining officer may request a driver's license and other vehicle documents, run a computer check on the car and driver, and issue a citation. If the driver produces a valid license and proof of right to operate the vehicle, the officer must permit the driver to continue on his way without delay for further questioning.

*Gregory,* 79 F.3d at 979 (citations omitted).

■ Only if a driver consents or the officers have reasonable suspicion of criminal activity may the defendants be detained for continued questioning. The defendants argue Rule lacked sufficient reasonable suspicion to detain them for questioning, citing *United States v. Wood,* 106 F.3d 942 (10th Cir.1997). The government argues it had sufficient reasonable suspicion to detain the defendants. The government relies on (1) the use of a rental car; (2) the defendants' plans to move from Las Vegas to Rhode Island with the rental car return date in Las Vegas five or six days later; (3) a permanent address in Rhode Island and a temporary address in Las Vegas; (4) Alley's "pretending" to be asleep; (5) Mendez's plans to travel to Boston to visit girls; (6) Mendez's failure to volunteer that he was traveling with the defendants, whereas the Ochoa admitted when asked that the vehicles were traveling together; and (7) Jimerson's having previously issued Mendez a warning for speeding and his suspicions that Mendez was a drug courier escort.

In *Wood,* the government argued the following facts provided reasonable, articulable suspicion sufficient to justify a detention of a vehicle: (1) Wood was an unemployed painter who flew to California for a two-week vacation and rented a car for the return trip; (2) Wood initially said he rented the car in San Francisco, but the rental papers indicated it was rented in Sacramento, Wood promptly corrected his error when confronted; (3) the presence of fast food wrappers and open travel maps in the passenger compartment; (4) Trooper Jimerson's subjective assessment that Wood appeared nervous; and (5) Wood's prior narcotics convictions. The Tenth Circuit rejected the district court's conclusion that these factors, separately or in the aggregate, provided probable cause to detain Wood. *Wood,* 106 F.3d at 946-48.

It is worth noting that Trooper Rule did not smell anything suspicious (e.g., raw marijuana, burnt marijuana, cologne, perfume or air freshener), and he did not see anything suspicious (e.g., pagers, vegetation, burnt vegetation, roaches, fake compartments, etc.). He was suspicious of the rental agreement showing the temporary Las Vegas address and the permanent Rhode Island address, although the driver gave a perfectly logical and legitimate explanation. He also was suspicious of the return date on the rental automobile (five to six days after the stop), although he did not produce the rental papers at the hearing and did not make inquiry of either Ochoa or Alley concerning the return date.

Trooper Rule then learned from Trooper Jimerson that:

(1) the second car was registered to defendant Alley;

(2) Jimerson had stopped Mendez a few weeks before; and,

(3) Mendez said he and the occupant of the Toyota were going to Boston to "visit some girls."

The troopers made some inferences and drew some conclusions they deemed consistent with criminal activity:

(1) Alley was pretending to be asleep;

(2) the second car occupants did not volunteer they were traveling with the first vehicle;

(3) Boston is a drug destination;

(4) Boston and Rhode Island are different destinations (the court takes judicial notice that Boston and Providence, Rhode Island are 50 miles apart);

(5) "Visit some girls" in Boston and moving to Rhode Island are different reasons to be traveling; and

(6) the drivers and occupants of the cars must be engaged in drug activity.

Here, the court rejects those inferences and conclusions and finds that the facts relied on by the government in this case, separately or in the aggregate, do not provide reasonable suspicion sufficient to justify a detention for further questioning or for purposes of subjecting the vehicle to a dog sniff.

Just as taking a vacation is not indicative of criminal conduct, moving from Las Vegas to Rhode Island, renting a car to assist in the move, and enlisting the help of others, are not unusual activities and are not indicative of criminal conduct. Rule did not ask Ochoa about the rental car return date and made no attempt to clear up any concerns. There are many plausible explanations. Ochoa told Rule they were trading off driving. It would be possible to complete the move and return the car within five or six days. The rental may have been one-way. *See Wood,* 106 F.3d 942 (rental papers indicated car stopped in Kansas was due to be returned to Sacramento the next day; when asked, driver explained the rental was one way and the rental car company was aware of this). Alley may have planned to extend the rental period or may have made arrangements for someone else to return the vehicle.

For someone moving from Las Vegas to Rhode Island, providing addresses from each location when renting a car is not suspicious behavior. As previously noted, Rule's conclusion that Alley was pretending to be

asleep is unsupported by any evidence. In any event, a sleeping passenger not engaged in illegal activity might not awaken at all or might choose to ignore what most people would regard as an unpleasant occurrence, and to the extent possible, go back to sleep.

With regard to Mendez's statement that he was going to Boston, the court notes that the government argued Rhode Island was close enough to Boston to be considered a destination area, but at the same time argued Mendez's travel plans were inconsistent with Ochoa's because Mendez was going to Boston and not Rhode Island. In any event, the court finds Mendez's indication that he and the other occupant of the Toyota were going to Boston is not inconsistent with Ochoa's statement that the vehicles were traveling together. As mentioned previously, the court has taken judicial notice that Boston is approximately 40 miles from Rhode Island. Alley and Ochoa may have wanted Mendez to come along to help with the driving, while Mendez's motivation was to visit Boston. Again, this does not in any way give rise to an inference of criminal conduct.

Mendez's failure to volunteer that he was traveling with the Lincoln is of no significance at all. Jimerson did not ask Mendez whether the vehicles were traveling together before Rule detained the defendants for questioning. Before the dog sniff, and when asked, Mendez told Jimerson the vehicles were traveling together. Mendez further indicated that the owner of the Toyota was traveling in the Lincoln. In other words, when asked, Mendez confirmed the information provided by Ochoa. Prior to being asked, Mendez may have assumed the officers already thought the vehicles were traveling together because the Toyota was registered in Alley's name and Mendez had provided Trooper Jimerson with the registration. Furthermore, Mendez may simply have provided the information requested— nothing more and nothing less.

With regard to Trooper Jimerson's recognition of Mendez and his suspicions that Mendez was an escort, Trooper Rule made no mention of this when asked to articulate the facts providing reasonable suspicion to justify his detention of the defendants. Fur-

thermore, where prior narcotics convictions of a detained defendant are not enough to provide reasonable suspicion, *see Wood, supra,* issuing a prior warning for speeding to another driver and unsupported suspicions regarding a completely unrelated third driver can hardly amount to reasonable suspicion for the detained driver.

Finally, this court does not give any weight to travel between so-called "source" and "destination" cities as evidence of criminal activity. Virtually every major population area falls into one or both of those categories. The court is unwilling to extend a suspicion of criminal drug activity to every traveler between major cities who passes through Kansas on the interstate highway system.

Even when all of these facts are considered together, there simply is not enough here to support an inference of criminal activity and the officers lacked reasonable suspicion to detain Ochoa and Alley for further questioning. Because the evidence is fruit of this illegal detention, it must be suppressed.

The government argues the court should defer to the judgment of trained agents on what constitutes reasonable suspicion, citing language from *United States v. Doyle,* 129 F.3d 1372 (10th Cir.1997). In *Doyle,* the Tenth Circuit said:

> To be sure, an officer's specific articulable facts, when viewed in isolation, will often comport with general notions of innocent travel rather than criminal activity ... Our task, however, is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention.

*Doyle,* 129 F.3d at 1376 (citing *United States v. Lopez–Martinez,* 25 F.3d 1481, 1484 (10th Cir.1994)).

This language cannot be read to afford the officers as much deference as the government seeks. While the Supreme Court has recognized that a trained officer's assessment of facts is a factor to consider when determining whether a detention was justified by reasonable suspicion of criminal activity, it has not relegated judicial review of police conduct to something akin to an "abuse of discretion" standard. *See e.g., United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (courts should consider trained officer's opinion that vehicle occupants "looked like Mexicans", nevertheless, this was insufficient to provide reasonable suspicion that occupants were illegal aliens).

The Court also has indicated that the facts must be viewed from the perspective of "an objectively reasonable police officer". However, even district court determinations of the existence of reasonable suspicion are not subject to a deferential standard of review, but must be reviewed de novo by appellate courts. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911, 916 (1996). Here, the court finds the facts cited by the government do not provide reasonable suspicion sufficient to justify the detention which occurred here, whether viewed from the perspective of an objectively reasonable trained officer or a reasonable citizen.

It is inappropriate for a court to articulate an innocent explanation of every fact, but the court cannot ignore that every piece of information gathered from the two vehicles by the troopers here was viewed in the light most unfavorable (i.e., the most suspicious way) to the defendants, which seems equally inappropriate. *Doyle* advises that specific articulable facts, viewed together through the lens of a reasonable law enforcement officer, must provide a reasonable suspicion of criminal activity to justify even a brief roadside detention.

If one looks closely enough, a perfectly guilty explanation can be found for nearly any innocent behavior and vice-versa—much is a matter of perspective. How much credit should courts give to an experienced law enforcement officer's hunch which uncovers criminal activity? Do the troopers have an obligation to probe further when obtaining information which can cut towards either guilt or innocence? Are the troopers entitled

to view the facts in the light most detrimental to the defendant, to reject all inferences supporting innocence and to embrace all inferences supporting criminal conduct? Where does a hunch end and good police work begin?

The court recognizes that Troopers Rule and Jimerson are devoted, professional law enforcement officers who are engaged in important and dangerous work. The court also recognizes the difficulties inherent in finding one's way through what appears to be, even to the court, a thicket of decisions which frequently obfuscate rather than illuminate, and which point in several directions, none of which may be the right direction even in remarkably similar circumstances. Any case can be distinguished on the facts.

Ultimately here, the facts must be viewed against the backdrop of the Fourth Amendment, which compels this result. The fact that drugs were found is an improper consideration for the court—the analysis and result would be the same if the troopers' search had yielded a sack of flour or box of cereal.

The court wishes it had the wisdom to reconcile the case law and formulate a bright-line rule which could provide some assistance to law enforcement, but the court invariably returns to the Fourth Amendment itself, which protects against unreasonable searches and seizures and which may provide the clearest statement of all.

II.  Other Pending Motions.

The defendants moved for release of *Brady* materials and Rule 16 evidence, and disclosure of evidence of prior wrongs and bad acts. The government responded to the *Brady* and Rule 16 motions, indicating it has an open file policy in this case and that lab reports and a transcript of the video tape should be in the file, but that some evidence of prior wrongs had not yet been disclosed. The government asks for reciprocal discovery. The defendants' discovery motions are granted, as is the government's request for reciprocal discovery. The government shall immediately provide the defendants with any evidence of prior wrongs and bad acts which it intends to use at trial. The defendants also moved in limine to exclude evidence of

prior wrongs and bad acts. They may renew such motions based on the government's disclosures.

IT IS ACCORDINGLY ORDERED this 6th day of April, 1998, that the defendants' motions to suppress are granted. It is further ordered that the defendants' discovery motions are granted. The defendants are ordered to provide reciprocal discovery to the government. The government is ordered to immediately provide the defendants with all evidence of prior wrongs and bad acts which the government intends to offer at trial. The defendants may renew their motions in limine after the government discloses all evidence of prior wrongs and bad acts.