**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 5, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TERRY LEE OCKERT, JR.,

    Defendant - Appellant.

No. 19-3049
(D.C. No. 6:17-CR-10151-EFM-1)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **HOLMES**, and **EID**, Circuit Judges.
_____

Defendant-Appellant Terry Ockert appeals the district court's denial of his

motion to suppress evidence seized from his car during a traffic stop.  He contends

that the police officer did not have the requisite reasonable suspicion to pull him over

and initiate the traffic stop in the first place.  He also argues that the plain view

doctrine did not justify the subsequent search of his car because the officers on scene

lacked lawful access to the vehicle.  Exercising jurisdiction pursuant to 28 U.S.C.

§ 1291, we affirm the district court's judgment.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

At around 1:00 a.m. on June 18, 2017, Officer Dailey was driving on a two-lane road and witnessed Terry Ockert's vehicle—which was roughly 1,000 feet ahead of his patrol car—veer to the left so much that it appeared to cross over into the oncoming lane of traffic. To catch up to Ockert, Officer Dailey increased his speed to 69 mph (the speed limit was 45 mph), then slowed to 63 mph, then slowed to 55 mph, which was the speed at which Ockert was driving. Ockert then veered into the lane of oncoming traffic again for about three seconds.

Ockert pulled off the road and into the gravel driveway of a private residence. After Ockert pulled off the road, Officer Dailey activated his emergency lights and stopped his patrol car behind Ockert's vehicle. Officer Dailey instructed Ockert to move away from the vehicle and shortly thereafter said, "I'm guessing the reason I saw you go left of center is probably 'cause you were watching me behind you, coming up behind you." ROA at 446.

Officer Dailey called for backup, and eventually Officer Rexroat arrived on scene. Both officers then peered through the windows of Ockert's car for roughly five minutes. During this time, Officer Rexroat observed a rifle in the front passenger seat. Rexroat also said that he smelled marijuana near the vehicle. When Officer Dailey asked Ockert about whether he had marijuana in the car, Ockert replied "no," but then added that "[i]f you would've said meth or something, [then] maybe." *Id*. at 323 (Presentence Investigation Report at 5); Aplt. Br. at 11.

Later during the stop, Officer Dailey observed what appeared to be narcotics inside of a bag located within a cigarette packet. He and Officer Rexroat then searched inside the car and eventually seized the bag of narcotics, the rifle in the front seat, and a drum magazine capable of holding 100 rounds of .22 caliber ammunition.

Ockert was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moved to suppress evidence derived from the traffic stop on the grounds that Officer Dailey lacked reasonable suspicion to pull him over, the stop was unreasonably delayed, and the officers lacked probable cause to search his vehicle. He specifically argued that the plain view doctrine could not justify the search because, according to him, the bag of narcotics was not in plain sight and the incriminating nature of the bag was not immediately apparent.

After conducting an evidentiary hearing on the matter, the district court denied the suppression motion. It found that Officer Dailey could have reasonably suspected Ockert to have violated the Kansas single-lane statute—K.S.A. § 8-1522(a)—mandating that drivers stay in their lane, reasoning that Ockert twice veered into the wrong lane and that there were no obstacles in the road or adverse weather conditions that would have made it impractical for Ockert to stay in the correct lane. The district court also found that the plain view doctrine gave the officers probable cause to search the vehicle because Officer Dailey saw a "white or clear substance" in the bag, he believed the substance was contraband, and he had a "lawful right of access

3

to the vehicle because he stopped Ockert pursuant to a lawful traffic stop." ROA at 177 (Order denying suppression motion at 10).

Ockert now appeals, challenging the initial traffic stop and the subsequent search of his vehicle. He argues that the government failed to show that it would have been practical for Ockert to maintain one lane, and that it therefore did not satisfy its burden of proving reasonable suspicion as articulated in *State v. Marx*, 215 P.3d 601 (Kan. 2009). He also argues that the plain view doctrine could not justify the officers' search of Ockert's car because the officers lacked a warrant to be on the private driveway and therefore lacked lawful access to the vehicle.

## II.

When reviewing a lower court's denial of a motion to suppress evidence obtained during a traffic stop, this court reviews the ultimate question of reasonableness de novo and findings of fact for clear error. *United States v. Saulsberry*, 878 F.3d 946, 949 (10th Cir. 2017). When doing so, we "view the evidence in the light most favorable to the government." *Id.* We consider any arguments not raised by the defendant in the original suppression motion to be waived. *United States v. Vance*, 893 F.3d 763, 769 (10th Cir. 2018).

## III.

The district court correctly found that Officer Dailey had reasonable suspicion to initiate the traffic stop.

A.

To initiate a traffic stop, an officer must have reasonable suspicion that the driver violated the law. *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). Such reasonable suspicion depends on the totality of the circumstances. *Id.* The government here "bears the burden of proving" that Officer Dailey reasonably suspected Ockert of violating the Kansas single-lane statute—K.S.A. § 8-1522(a)— mandating that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane." *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017).

The Kansas Supreme Court in *Marx* provided guidance for what is required of the government to show that an officer had reasonable suspicion of a § 8-1522(a) violation. There, after witnessing a motorhome cross over the fog line, overcorrect, then cross over the lane line, a police officer stopped the motorhome and eventually found narcotics onboard. *Id.* at 604. The trial court granted the defendants' subsequent motion to suppress the evidence on the ground that the officer lacked reasonable suspicion of a § 8-1522(a) violation. *Id.* The State appealed and the appellate court reversed, finding reasonable suspicion to exist. *Id.*

But the Kansas Supreme Court reversed the appellate court, finding that the State failed to meet its burden of proving reasonable suspicion. *Id.* at 613. To demonstrate reasonable suspicion of a § 8-1522(a) violation, the court asserted, "a detaining officer must articulate something more than an observation of one instance of a momentary lane breach." *Id.* at 612. Further, the court reiterated, it was the State's burden to show that the officer had an "objectively reasonable belief" that it

5

would have been practical for the driver to maintain a single lane.  The government

ultimately failed this burden, the court reasoned, because the officer observed only

one lane departure, offered no testimony about how far the motorhome departed from

its lane, and "shared no information . . . from which the court could . . . infer that it

was practicable to maintain a single lane."  *Id*. at 613.

Marx thus articulates two rules to consider when determining whether the

government here met its burden of showing that Officer Daily reasonably suspected

Ockert of violating § 8-1522(a).  The first is that an officer must typically observe

more than one lane departure, and therefore one momentary lane departure—by

itself—is generally not enough to support reasonable suspicion.  *Id*.  Of note,

however, this court has not interpreted *Marx* to categorically hold that drivers must

leave their lane more than once.  *See United States v. Barraza-Martinez*, 364 F.

App'x 453, 457 (10th Cir. 2010) (unpublished) ("*Marx* rejected the notion that every

intrusion upon a lane's marker lines gives rise to reasonable suspicion, but also

stopped short of holding that a single swerve can never amount to reasonable

suspicion.").[1]

The second rule is that the government must provide information "from which

the court could . . . infer" that it was practical for the driver to stay in one lane.

*Marx*, 215 P.3d at 613.  Such information can consist of dashcam video showing the

road and weather conditions during the traffic stop, even if the video does not show

---

[1] We may cite an unpublished opinion for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the conditions at the exact moments when the driver departed his lane.  *See United State v. Angeles*, 725 F. App'x 624, 626–28 (10th Cir. 2018) (unpublished).  For example, in *Angeles*, this court found that dashcam video of the weather and road conditions was sufficient to satisfy the government's burden to present evidence of "driving conditions" as required by *Marx*.  *See id*. at 628.  There, we affirmed the lower court's finding that an officer reasonably suspected a § 8-1522(a) violation where the driver departed his lane twice and dashcam video showed that the driving conditions were adequate.  *Id*. at 627–28.  We noted that the facts were different from those in *Marx* because 1) the driver departed his lane twice, 2) the government provided testimony about how far the driver's car crossed over the lane line, and 3) dashcam video depicted what the driving conditions were at the time.  *Id*.  Of note, the dashcam video in *Angeles* did not show what the driving conditions were at the exact time of the lane departures because, due to camera overexposure from sunlight during the relevant moments, "there was no clear footage of Mr. Angeles's car going over the fog line."  *Id*. at 626 n.1.

It is possible that the behaviors of others on the road can justify a driver's lane departure.  For example, in *United States v. Ochoa*, the district court found that an officer's driving behavior made such a "commotion" that it caused another driver to depart his lane.  4 F. Supp. 2d 1007, 1012 (D. Kan. 1998).  There, a Lincoln was traveling along an interstate highway followed by a Toyota.  *Id*. at 1009.  The police officer pulled up along the Toyota and drove adjacent to it for fifteen seconds.  *Id*.  During this time the Lincoln briefly departed its lane, prompting the officer to pull it

7

over.  *Id*.  The officer eventually found drugs in the Lincoln, but the lower court suppressed this evidence, finding that the officer's driving caused the Lincoln to drift out of its lane, and thus that the officer lacked reasonable suspicion to initially pull the Lincoln over.  *Id*. at 1012.

B.

We find that Officer Dailey had reasonable suspicion that Ockert violated K.S.A. § 8-1522(a) for failing to maintain a single lane.  According to *Marx*, the government generally needs to present two things to show that an officer had the requisite reasonable suspicion: 1) evidence that the driver departed his lane at least twice, and 2) evidence of the driving conditions from which a court could infer that it would have been practical for the driver to stay in his lane.  *See* 215 P.3d at 613.

Here, the government satisfied both of the *Marx* requirements.  First, Officer Dailey testified that he observed Ockert depart his lane twice, and one of these lane departures was recorded by the officer's dashcam video.  Second, the dashcam video conveyed that the weather and road conditions were clear at the time of Ockert's second lane departure, and thus that it would have been practical for Ockert to stay in his lane.  It should be of no matter that the dashcam video did not also show what the road and weather conditions were at the exact time of the first lane departure.  All that *Marx* requires is that the government provide "information about the traffic conditions . . . from which the court could . . . infer that it was practical to maintain a single lane."  *Id*.  And we can infer from the video—which began recording seconds after the first lane departure occurred—that the driving conditions during the first

8

lane departure were similarly adequate for Ockert to have safely stayed in one lane. Further, as this court found in *Angeles,* dashcam video of the driving conditions around the time of a lane departure can satisfy the *Marx* requirement even when the video does not capture the full extent of the lane crossing or weather conditions at the exact moment of the departure. *See Angeles*, 725 F. App'x at 626 n.1.

We are not persuaded by Ockert's reliance on *Ochoa* to show that Dailey's driving made it impractical for Ockert to stay in his lane. As the district court noted, *Ochoa* is distinguishable from the facts here. In *Ochoa*, the police officer created a "commotion" by driving directly alongside the tail vehicle of what appeared to be a caravan. 4 F. Supp. 2d at 1012. The officer's driving behavior in *Ochoa* was thus more disruptive than Officer Dailey's driving here, which entailed speeding up to—but staying directly behind—Ockert on the two-lane road. It is true that Officer Dailey later told Ockert that the reason he departed his lane was "probably" because he was "watching" Officer Dailey "coming up behind [him]." ROA at 446. But for several reasons, this statement does not detract from Officer Dailey's reasonable suspicion. First, according to Officer Dailey's testimony, he uttered the statement during the traffic stop in an effort to calm Ockert down. *Id.* Second, as Ockert concedes, Officer Dailey's subjective beliefs do not matter when determining whether he had reasonable suspicion. Aplt. Br. at 30 (*citing Winder*, 557 F.3d at 1134). Third, Officer Dailey's statement does not account for the first lane departure that occurred before Dailey sped-up towards Ockert.

9

For the above reasons, we conclude that Officer Dailey had reasonable suspicion to initiate the traffic stop.

IV.

We conclude that Ockert waived the argument he makes before us about why the plain view doctrine does not apply to the seized evidence. He currently argues that, even if the initial traffic stop was constitutional, the drugs and weapons seized from his car should be suppressed because the officers did not have lawful access to his vehicle at the time of the seizure. But Ockert did not raise this argument below.

When a litigant fails to raise an argument below, she typically either forfeits or waives that argument upon appellate review. If the litigant's failure was due to neglect, she is usually deemed to have forfeited her argument and therefore must prove plain error in order to succeed on appeal. *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 991 (10th Cir. 2019). By contrast, if evidence shows that the litigant was aware of the argument below yet consciously chose to forgo it, she is generally deemed to have waived the argument and therefore has no rights to appellate review. *Id.*

Specifically, this court has held that waiver applies to suppression-related arguments not raised in the defendant's original motion to suppress. *United States v. Burke*, 633 F.3d 984, 990–91 (10th Cir. 2011). Our holding in *Burke* relied on Fed. R. Crim. P. 12, which—up until 2014—established that a party "waives any Rule 12(b)(3) defense, objection, or request [which includes motions to suppress evidence] not raised" below. *Id.* at 987 (alterations in original). This "waiver provision," we

10

found, "applied not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion." *Id*. (quoting *United States v. DeWitt*, 946 F.2d 1497, 1502 (10th Cir. 1991)). And though Congress amended Rule 12 in 2014 by deleting the word "waives" from the rule's text, this court still interprets Rule 12 to bar appellate review of suppression-related arguments not raised below. *See United States v. Bowline*, 917 F.3d 1227, 1229 (10th Cir. 2019) ("reject[ing] the view that the [2014] amendments effect[ed] any relevant change" to Rule 12); *see also Vance*, 893 F.3d at 769 n.5 (noting that the 2014 amendments did not abrogate the "waiver rule set out in *Burke*").

Ockert's current argument about why the plain view doctrine should not apply to the seized evidence is notably different than the plain view doctrine argument that he brought below. It is true that both here and below he argued that the plain view doctrine should not apply. It is also true that Ockert's arguments here and below both challenge two of the four elements of the plain view doctrine articulated in *Corral*.[2] But the two *Corral* elements on which Ockert currently relies are separate and distinct from the other two elements that underscored his argument below.

When arguing below that the government failed to satisfy *Corral*, Ockert hinged his argument entirely on the first and fourth elements of the standard. He

---

[2] This court in *United States v. Corral* held that the plain view doctrine applies only when four elements exist: "(1) the item [wa]s indeed in plain view; (2) the police officer [wa]s lawfully located in a place from which the item c[ould] plainly be seen; (3) the officer ha[d] a lawful right of access to the item itself; and (4) it [wa]s immediately apparent that the seized item [wa]s incriminating on its face." 970 F.2d 719, 723 (10th Cir. 1992).

11

argued that the plain view doctrine did not apply to the officers because the bag of narcotics was never in plain sight and its incriminating nature was not immediately apparent. This challenge, Ockert argued, concerned only the first and fourth elements of the plain view doctrine articulated in *Corral*. ROA at 158 (Defendant's Reply to Response of United States to Defendant's Motion to Suppress at 9) ("The first and fourth elements are lacking here.").

Here, however, his argument relies completely on the second and third elements of *Corral*. As this court articulated in *Corral*, the second and third elements required for the plain view doctrine are, respectively, that the officer was "*lawfully located* in a place from which the item c[ould] plainly be seen," and that the officer had a "*lawful* right of *access*" to the seized item. *Corral*, 970 F.2d at 723 (emphasis added). These elements are the subject of Ockert's current argument that the officers were not "lawfully in a position" to access Ockert's vehicle because it was on a private driveway and the officers lacked a warrant. Aplt. Br. at 39.

Ockert contends that even if he did not personally preserve this argument below, he is still entitled to appellate review because the district court preserved it for him. He contends that if a litigant neglected to raise an argument below, yet the district court nonetheless addressed it sua sponte, the issue is deemed to have been preserved for appeal and the litigant can raise the issue without having to prove plain error. According to Ockert, the lower court addressed his argument—that the officers lacked lawful access to his vehicle because they were on a private driveway—when it generally found that the officers "had a lawful right of access to

12

the vehicle because [they] stopped Ockert pursuant to a lawful traffic stop." Reply Br. at 12 (quoting ROA at 177 (Order denying suppression motion at 11)).

But for two reasons we reject Ockert's contention that the district court preserved his "not lawfully located" argument for him. First, as this court articulated in *Tesone v. Empire Marketing Strategies*, the district court can only preserve arguments for appeal when the litigant merely would have forfeited such arguments rather than *waive* them. 942 F.3d at 992. And because Ockert waived—instead of merely forfeited[3]—his argument by failing to raise it in his suppression motion, the district court was unable to preserve the argument for appeal.

Second, even if the district court could have theoretically preserved Ockert's argument for appeal, it did not do so here because it did not adequately address the argument. For a district court to preserve an argument for appeal it must "appl[y] the relevant law to the relevant facts." *Tesone*, 942 F.3d at 992; *see also United States v. Verner*, 659 F. App'x 461, 466 (10th Cir. 2016) (unpublished) (finding that the district court did not preserve the government's new argument—that the smell of marijuana emanating from a vehicle broke the causal chain between an illegal arrest

---

[3] Ockert contends that he forfeited—rather than waived—his plain view argument because nothing shows that he affirmatively wished to forgo it. But the argument would still be waived here even if Ockert's failure to preserve it below was unintentional. First, as explained above, suppression-related arguments are automatically waived if not preserved below. Second, Ockert failed to argue the plain error standard of review in his opening brief before us. And this court has found that non-preserved arguments are typically waived on appeal if the litigant "did not argue for plain error in his opening brief." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

13

and the seizure of evidence—because the lower court did not "make relevant factual findings about the purported smell of marijuana").  Here, the district court did not assess the most relevant fact in Ockert's new argument—that the vehicle was located on a private driveway—because, as Ockert concedes, he "did not explicitly point out [to the district court] that the officers intruded on private property."  Reply Br. at 11.

V.

For the above reasons, we AFFIRM the district court's denial of Ockert's motion to suppress.

Entered for the Court


Allison H. Eid<br>
Circuit Judge

14

No. 19-3049, <u>United States v. Terry Ockert</u>

**LUCERO**, J., concurring in part and dissenting in part:

I concur in the majority's conclusion that Terry Ockert waived his argument that the plain view doctrine does not apply to the seized evidence. However, I respectfully dissent from the majority's analysis of whether the state met its burden of showing that Deputy Dailey had an objectively reasonable belief that it would have been practicable for Ockert to stay in his lane despite the commotion caused by Dailey's driving. Because Dailey's driving created the conditions that led to Ockert briefly leaving his lane, Dailey's suspicion that Ockert violated K.S.A. § 8-1522(a), the Kansas single-lane statute, was unreasonable. Officers cannot cause a traffic violation and then rely on the violation they caused as reasonable suspicion for a traffic stop.

**I**

Ockert was driving on a poorly lit, two-lane country road. It was a dark night with no moonlight. At 1:20 AM, Dailey was driving about 1,000 feet behind Ockert when he saw Ockert briefly cross the center line of the road. Dailey could not see whether any obstructions caused this deviation.

Dailey then accelerated to 69 miles per hour, exceeding the road's speed limit of 45 miles per hour. He pulled up directly behind Ockert while driving over the speed limit and without turning on his lights or siren, in violation of Sedgwick County Sheriff's Office policy. At no point did Dailey provide any indication that he was a police officer.

Ockert tapped on his brakes several times as a warning, indicating his attention on Dailey's driving.

While Ockert was focused on Dailey's driving, the back-left tire of his vehicle touched the centerline for a few seconds. Only then did Dailey turn on his lights and pull Ockert over for violating § 8-1522(a), which requires that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane." Dailey approached the vehicle and, during his conversation with Ockert, said "I'm guessing the reason I saw you go left of center is probably cause you were watching me behind ya, coming up behind ya." He later testified that he said this to calm Ockert down, not because it was true.

Ockert challenged the validity of this stop, arguing that because Dailey's driving caused him to cross the center line, Dailey did not have reasonable suspicion that Ockert violated § 8-1522(a). The district court rejected this argument. The court reasoned that because Dailey observed Ockert's vehicle cross the center line twice and there were no obstacles in Ockert's lane of travel or adverse weather conditions, Dailey had reasonable suspicion and the stop was lawful under the Fourth Amendment. The court noted that while Dailey's driving is relevant to whether Ockert actually violated § 8-1522(a), his driving did "not affect the Court's ultimate determination of whether Deputy Dailey had reasonable suspicion that Ockert committed the traffic violation."

## II

Section 8-1522(a) requires that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane." This statute was interpreted by the Kansas Supreme Court

-2-

in State v. Marx, 215 P.3d 601 (Kan. 2009).  Marx noted that § 8-1522(a) is not a strict liability offense.  Id. at 612.  It does not transform "any and all intrusions upon the marker lines" into violations.  Id.  Rather, the statute "only requires compliance with the single lane rule as nearly as practicable, i.e., compliance that is close to that which is feasible."  Id. (emphasis in original).  An "incidental and minimal lane breach" is not enough to violate § 8-1522(a).  Id.

The burden is on the government to demonstrate that it was practicable for the driver to stay in his or her lane.  Id. at 613.  When determining whether an officer has reasonable suspicion, the focus is "on what [the officer] knew, when he knew it, and whether the known facts provided him with a reasonable and good faith belief that a traffic infraction had occurred."  Id.  If the officer knows of circumstances that render it impracticable for a driver to stay in his or her lane but still effects a stop, the officer's suspicion is not reasonable.  Id.

The district court was correct that under normal circumstances, observing a vehicle depart from its lane twice within a short period of time and in the absence of obstacles may be enough to provide an officer with reasonable suspicion that § 8-1522(a) has been violated.  However, when an officer's actions make it impracticable for a driver to stay in his or her lane, the officer cannot then rely on the lane departure for reasonable suspicion.  By consequence, courts should not consider an officer-induced departure when determining if there was reasonable suspicion.  The commotion caused by the officer does not need to be so great that it is impossible for the driver to stay in his or her

-3-

lane.  Under Marx, the driver need only stay in his or her lane as "close to that which is feasible" under the conditions created by the officer's driving.  Id. at 612.

Dailey was not justified in relying on Ockert's second departure to form reasonable suspicion.  Under the circumstances, it was objectively unreasonable for Dailey to assume that Ockert's second departure was unrelated to his driving or that Ockert's compliance was not "close to that which is feasible."  Dailey rapidly approached Ockert's vehicle from behind on a dark night without turning on his lights or siren.  Before the back-left tire of Ockert's vehicle briefly crossed the center line, Ockert pushed on his brakes a few times as a warning.  This action suggests that Ockert's attention was on Dailey, and reasonably so.  Though Dailey's driving did not make it impossible for Ockert to stay in his lane, it caused a sufficient disturbance to justify briefly crossing the center line.  Ockert's driving was not perfect, but it was close to that which is feasible.  That is all § 8-1522(a) requires.

Removing the second lane departure from the reasonable suspicion analysis, Dailey did not have reasonable suspicion that Ockert violated § 8-1522(a).  Dailey only observed one other brief lane departure, and, as the Kansas Supreme Court held, an "incidental and minimal lane breach" is not enough to violate § 8-1522(a).  Id.  Though the Kansas Supreme Court left open whether a single lane breach, if sufficiently egregious, can violate the statute, there is no evidence that Ockert's initial lane departure was egregious.  Dailey testified that he saw Ockert briefly leave his lane and was unable to see if there was any obstruction that forced him to do so.  Accordingly, I conclude that

-4-

Dailey did not have reasonable suspicion that Ockert violated § 8-1522(a) and the stop was therefore unlawful.  I respectfully dissent.