**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 9 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

     No. 98-8052

RUSSELL WILLIAM PATTEN,

     Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 96-CR-127-J)**

David A. Kubichek, Assistant United States Attorney (David D. Freudenthal, United States Attorney with him on the brief), Casper, Wyoming for Plaintiff-Appellee.

Jeffrey L. Russell (Victor D. Vertner with him on the brief), San Jose, California for Defendant-Appellant.

Before **PORFILIO**, **McWILLIAMS**, and **BALDOCK**, Circuit Judges.

**BALDOCK**, Circuit Judge.

Federal prosecutors charged Defendant Russell William Patten in a one-count information with possession of thirty-nine pounds of ephedrine, a chemical used to produce methamphetamine, in violation of 21 U.S.C. § 841(d)(2). Defendant filed a

motion to suppress the ephedrine, which a Wyoming state trooper found in Defendant's suitcase following a routine traffic stop. According to Defendant, the officer: (1) unlawfully detained Defendant longer than necessary to effectuate the purpose of the stop; (2) exceeded the scope of Defendant's consent by searching his suitcase; and (3) lacked probable cause to arrest Defendant. Following an evidentiary hearing, the district court denied Defendant's motion. Defendant subsequently entered a conditional plea of guilty pursuant to Fed. R. Crim. P. 11(a)(2), and the district court sentenced him to forty-six months imprisonment. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

I.

The historical facts as found by the district court are undisputed. At the suppression hearing, Wyoming state trooper Daniel Dyer, a twenty-year veteran of the force, testified that on November 13, 1996, he was patrolling along I-80 west of Laramie. At approximately 12:45 p.m., Officer Dyer clocked Defendant's vehicle traveling westbound at 77-78 miles per hour in a 75 miles per hour zone. Officer Dyer stopped Defendant. Defendant informed the officer that he was traveling from New York to California in a rental car. After determining that Defendant's driver's license was valid and that he was lawfully in possession of the vehicle, Officer Dyer gave Defendant a warning ticket and returned his documentation.

When Officer Dyer returned to Defendant's vehicle, Defendant was reading a road map. Defendant asked the officer about tourist attractions in the vicinity. Officer Dyer

mentioned a territorial prison and national park, but Defendant indicated he wanted to stay on I-80.  Officer Dyer then asked Defendant how he got to New York.  Defendant responded that he flew from California with a deceased friend's ashes for burial.

Officer Dyer inquired about how many suitcases Defendant was carrying. Defendant informed the officer that he had two suitcases–one in the back seat and one in the trunk.  Officer Dyer asked Defendant if he was carrying anything illegal in the trunk. Defendant did not respond.  Officer Dyer then stated:  "Well, do you think we could take a look at your suitcase there?  I don't want to necessarily look in it, but – nor do I want to read any letters necessarily, but maybe we could just take a look?"  Defendant responded "okay" and opened the trunk of the vehicle with his keys.

Inside the trunk was a large, soft-sided suitcase.  Officer Dyer pushed down on the suitcase and then tried to slide it with his hand.  He noted the suitcase was quite heavy. Officer Dyer commented:  "What do you got in there, the airplane tire from the jet that you flew into New York City on?"  Defendant did not respond.  Officer Dyer then stated: "Well, let's just unzip it."  Defendant partially unzipped the suitcase to a point where straps surrounded it.  Officer Dyer stated:  "To unzip it more, you just got to squeeze the prongs there.  Just squeeze them together there and it will open up."  Defendant hesitated. Officer Dyer reiterated:  "Well, just squeeze them together and it will come out." Defendant unbuckled the suitcase's straps.  Officer Dyer stated:  "Well then, we'll just have to unzip it."

Defendant unzipped the suitcase. When Defendant began shuffling a leather jacket which rested on top of the suitcase's contents, Officer Dyer noticed a green plastic sack underneath the jacket. Officer Dyer asked: "Well, what is that?" Defendant again did not respond. Officer Dyer pulled open the green sack and saw several clear plastic baggies containing a white powdery substance. Officer Dyer ordered Defendant to give him the keys to the rental car. Officer Dyer asked Defendant to identify the substance in the baggies. Defendant responded that although he did not own the suitcase, he believed the substance was either dextrose or steroids. Approximately twenty-five minutes after the initial stop, Officer Dyer summoned a canine unit to the scene. He also requested cocaine and methamphetamine test kits. The canine alerted around the rear of the vehicle and directly on the suitcase. Officer Dyer placed Defendant under arrest. Officials subsequently determined that the substance was ephedrine, a federally controlled chemical substance used in the production of methamphetamine.

Based upon Officer Dyer's undisputed testimony, the district court denied Defendant's motion to suppress. In a thorough, written order, the court held that (1) Defendant's continued detention after the initial stop was "an ordinary consensual encounter" between Defendant and Officer Dyer; (2) Defendant voluntarily consented to the search of his suitcase; and (3) the canine's alert on the suitcase established probable cause to arrest Defendant. As to probable cause, the court held in the alternative that "the finding of several small packages of a powdery substance packaged in the exact way that

4

Officer Dyer had previously observed illegal drugs to be packaged, constituted probable cause for defendant's arrest."

## II.

In reviewing the denial of a motion to suppress, we view the evidence in a light most favorable to the government. United States v. Gordon, 173 F.3d 761, 765 (10th Cir. 1999). We review the district court's findings of historical fact for clear error and give due weight to inferences which the district court draws from those findings. See Ornelas v. United States, 517 U.S. 690, 699 (1996). The credibility of witnesses and the weight to be given the evidence is the province of the district court. United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997). The district court's ultimate determination as to the constitutionality under the Fourth Amendment of a law enforcement official's action is a question of law reviewable de novo. See United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997).

## A.

Defendant first complains that Officer Dyer unlawfully detained him in violation of the Fourth Amendment by continuing to question him after returning his driver's license and rental agreement. As a result, Defendant asserts that the fruits of that unlawful detention, i.e., the ephedrine, must be suppressed. Generally, an investigative detention must "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). When a driver has produced a valid license

5

and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning. United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998). Two exceptions to this general rule exist however. An officer may question the driver further if (1) the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to further questioning. Id. Because the Government acknowledges that Officer Dyer had no reasonable and articulable suspicion of illegal activity when he continued to question Defendant after returning his documentation, we are concerned only with whether Defendant voluntarily consented to Officer Dyer's questioning.

Because a consensual encounter is voluntary, such an encounter does not constitute a "seizure" within the meaning of the Fourth Amendment. "A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." United States v. Werking, 915 F.2d 1404, 1408 (10th Cir. 1990). In contrast, an individual is "seized" when he has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way. Id. The question of whether an encounter was consensual "calls for the refined judgment of the trial court." Id. at 1409.

We cannot say on the record before us that the district court's findings on this question constitute reversible error. Officer Dyer was not required to inform Defendant

6

that he was free to leave. See Gordon, 173 F.3d at 765 (encounter does not become non-consensual simply because an officer fails to advise defendant that he does not have to respond to the officer's questioning and is free to leave). Importantly, Officer Dyer did not constrain Defendant by a "coercive show of authority" which might have rendered Defendant's encounter with Officer Dyer involuntary. See Elliott, 107 F.3d at 814 (return of a driver's documents does not end a detention if evidence establishes a coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching, or the use of commanding language, indicating that compliance is required). Defendant in fact encouraged the encounter when he asked Officer Dyer about tourist attractions in the area after the officer had returned his documentation. Officer Dyer's subsequent questions to Defendant regarding illegal contraband, and his request to "take a look," were not sufficient to render an otherwise consensual encounter coercive. See United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996).

### B.

Defendant next contends that even if he consented to Officer Dyer's questioning following the initial stop, he did not consent to Officer Dyer's search of his suitcase. Valid consent is that which is freely and voluntarily given. United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998). Whether a consent to search during a consensual encounter with a police officer is voluntary is a question of fact to be determined from the totality of the circumstances. Ohio v. Robinette, 519 U.S. 33, 40 (1996) ("The Fourth

Amendment test for a valid consent to search is that the consent be voluntary and voluntariness is a question of fact to be determined from all the circumstances.") (internal quotations and brackets omitted). The burden is on the government to show that the consent was voluntary. Hernandez, 93 F.3d at 1500. In determining the scope of a defendant's consent, we ask what a reasonable person would have understood by the exchange between the defendant and police officer. Elliott, 107 F.3d at 815. A defendant's silence and acquiescence may support a finding of voluntary consent. Gordon, 173 F.3d at 766. Moreover, a defendant's "failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." Id.

During their conversation, Officer Dyer stated to Defendant: "Well, do you think we could take a look at your suitcase there? I don't want to necessarily look in it." The district court found the language–

> "I don't <u>necessarily</u> want to" alerts the hearer that there is a possibility of looking into the suitcase, although it may not be necessary to do so. This court finds that a reasonable person hearing this request would understand it to mean that the officer may, or may not, want to look into the suitcase.

(emphasis in original). Additionally, the court found Defendant's silence and acquiescence in opening his suitcase indicated that Defendant's consent to search was not limited to examining the exterior of the suitcase: "Defendant's silence and cooperation in opening the suitcase can be seen as part and parcel of his earlier consent to search the suitcase, a search that might or might not include the inside of the suitcase." Again, we

8

cannot say that the district court's findings on this question constitute error when viewed in a light most favorable to the government.

This case is unlike our decision in Elliott, 107 F.3d at 810. In that case, the same Officer Dyer testified at a suppression hearing that he asked the defendant if he could "look through the trunk there and see what you got in there? I don't want to look through each item." Officer Dyer also informed the defendant that he just wanted to see how things were "packed" or "packaged." Id. at 815. After defendant opened the trunk from inside her vehicle, Officer Dyer proceeded to unzip defendant's luggage in the trunk, outside of her presence. In reversing the district court's denial of the defendant's motion to suppress, we concluded that Officer Dyer's questioning "would have conveyed to a reasonable person that Dyer was interested only in visually inspecting the trunk and its contents, and did not convey his intent to look into any containers in the trunk." Id.

In contrast, Officer Dyer did not inform Defendant in this case that "he just wanted to see how things were 'packed' or 'packaged'" in the trunk. Id. The district court found that by his questioning, Officer Dyer left open the distinct possibility that he might wish to view the inside of Defendant's suitcase. Moreover, Defendant accompanied Officer Dyer to the rear of the vehicle. Defendant, not Officer Dyer, unzipped his suitcase. At no time did Officer Dyer make a "coercive show of authority" towards Defendant, and at no time did Defendant object to unzipping his suitcase. See Gordon, 173 F.3d at 766 (defendant's failure to object to a search of his locked bag after officer asked "can you

9

open that" deemed significant to court's finding that consent to search was voluntary). The district court reasonably construed Officer Dyer's questioning in this case together with Defendant's verbal and nonverbal responses as constituting a voluntary consent to search the contents of his suitcase.

C.

Finally, Defendant contends that because the government failed to produce any evidence regarding the canine's accuracy in detecting ephedrine, the canine alert on his suitcase did not constitute probable cause to arrest him. To determine if probable cause for a warrantless arrest exists, we ask whether at the time of the arrest, the facts and circumstances within the arresting officer's knowledge were sufficient to justify a prudent officer in believing the defendant was engaged in illegal activity. Gordon 173 F.3d at 766. As a general rule, an alert from a canine with a sufficient accuracy record is sufficient to establish probable cause. United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993). The problem in this case is that the canine had never been trained to alert on ephedrine. Rather the canine had been trained to alert on, among other drugs, methamphetamine, of which ephedrine is a component.

We need not resolve this problem here, however, for we agree with the district court that aside from the canine alert, the facts in this case established probable cause for Defendant's arrest. Officer Dyer observed several small packages of a powdery substance in Defendant's suitcase. See United States v. Trimble, 986 F.2d 394, 399 (10th

10

Cir. 1993) (officer's observation of amber colored pill vile containing what he believe to be rock cocaine established probable cause to arrest defendant). Defendant also stated that (1) the substance might be steroids (an illegal substance); (2) he did not own the suitcase; and (3) he was traveling one way from New York to California in a rental car. Under these facts and circumstances, Officer Dyer was justified in his belief that Defendant was engaged in illegal activity.

AFFIRMED.