**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 18 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

MARTIN J. RODRIGUEZ,

　　　　Defendant - Appellant.

No. 99-3004

(D.C. No. 98-CR-40015-RDR)

(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McKAY**, and **MURPHY**, Circuit Judges.

　　　　Defendant-Appellant Martin J. Rodriguez appeals the order of the district court denying his motion to suppress evidence seized during a traffic stop and statements made following the stop and his arrest. Defendant pleaded guilty to knowing and intentional possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(2) and 18 U.S.C. § 2. His plea was conditional, preserving his right to appeal the district court's evidentiary ruling. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

The traffic stop in question occurred on February 17, 1998, along a stretch of I-70 running through Lincoln County, Kansas. After observing two traffic violations, a Kansas Highway Patrol officer stopped a red Nissan sedan which Alice Griego was driving and in which Defendant was a passenger. The officer testified that he observed the sedan cross the fog line onto the left shoulder of the highway a couple times as it was approaching him and that, as he approached the sedan from the rear before turning on his emergency lights, he observed what appeared to be a small child bouncing around in the rear seat unrestrained by a seat belt. At that point, the officer turned on his lights and initiated a traffic stop on the vehicle.

After stopping the car, the officer approached Ms. Griego on the driver's side, explained why he had stopped the vehicle, and requested a driver's license and proof of insurance. Ms. Griego gave him her driver's license, but she was unable to produce insurance, registration, or other proof of ownership. The officer then requested identification from Defendant; Defendant gave the officer his name and what turned out to be a false date of birth. After getting what information he could from Defendant, the officer had Ms. Griego accompany him to his patrol car. They discussed her and Defendant's trip from Los Angeles to Kansas City while waiting for the police dispatcher to confirm that Ms. Griego's driver's license was valid and that neither occupant had outstanding warrants.

After checking Ms. Griego's driver's license and the documentation that she eventually produced showing the car registered to a Maria or Rosa Ochoa, the officer returned the documentation to Ms. Griego and issued her a verbal warning to stay in one lane of travel and to keep her child properly restrained.

At that point, based on his observations of Ms. Griego's demeanor and the inconsistencies in her story about how she came to be driving the sedan from California to Kansas, the officer requested permission to ask Ms. Griego a few more questions, and she agreed to talk with him further. He asked her if she was carrying anything illegal in her car and she said no. He then asked her if he could search the car. She said that he would have to ask Defendant.[1] The officer testified that, at this point, he exited his vehicle and went to speak with Defendant who was still sitting in the passenger seat of the sedan. He asked Defendant if he and Ms. Griego were carrying anything illegal. Defendant answered that they

_____

[1]Up to this point in the traffic stop, the officer's version of events is supported by the videotape recording made from the camera mounted inside his car. See Add. to Opening Br. (videotape). Unfortunately, the tape ran out as he exited his car and approached Defendant in the passenger seat to ask for his consent to search the vehicle. From that point, the version of circumstances Defendant presented at the motion hearing differs from the version provided by the officer. Compare App. at 59-61 with id. at 30-33. Defendant testified that the officer approached him on the passenger side of the sedan, ordered him out of the car, and told him to stand seven feet in front of it. Defendant testified that he complied with the officer's orders and the officer then began searching the vehicle despite Defendant's adamant protests that his civil rights were being violated. According to Defendant, the officer opened the trunk of the sedan for himself. See id. at 61.

were not. The officer then asked Defendant if he could search the car. The officer testified that Defendant answered yes, exited the sedan, and opened the trunk of the sedan for the officer. Another highway patrolman arrived on the scene to assist, and, in the course of searching the trunk and the rest of the vehicle, the first officer discovered wrapped bundles of what turned out to be methamphetamine hidden within the sedan's interior side-body panels. After finding the drugs, Defendant and Ms. Griego were placed under arrest and given <u>Miranda</u> warnings. Defendant initially indicated that he was unaware that the drugs had been in the car. Later, he admitted to the officers that his purpose in arranging for he and Ms. Griego to drive the car from Los Angeles to Kansas City was to deliver the drugs to an unknown buyer. Defendant agreed for a time to assist in a controlled delivery to the buyer; however, he eventually became uncooperative, causing the police to abandon the controlled delivery plans.

The district court held an evidentiary hearing on Defendant's motions to suppress the drugs seized during the traffic stop and the statements he made following the stop and his arrest. After hearing testimony from Defendant and the officer and receiving supplemental briefing, the district court denied the motions to suppress. On appeal, Defendant argues that the evidence should be suppressed because (1) the traffic stop was an unlawful violation of Defendant's Fourth Amendment rights in that the officer acted without reasonable suspicion; (2) even

if the stop was justified initially, the officer detained Defendant beyond the scope of legitimate detention, thus violating his Fourth Amendment rights; and (3) neither Defendant nor Ms. Griego consented to the search of the sedan, and because the officer had no probable cause, the resulting search violated Defendant's Fourth Amendment rights. When "reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous." United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir. 1995). We consider the totality of circumstances and view the evidence in the light most favorable to the non-moving party. See United States v. Villa-Chaparro, 115 F.3d 797, 800-01 (10th Cir. 1997). "The ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review de novo." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

## I.

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Wren v. United States, 517 U.S. 806, 810 (1996); accord Botero-Ospina, 71 F.3d at 787. In the case at hand, the officer testified that he initiated the traffic stop after observing the sedan cross the fog line onto the left shoulder of the highway a couple times

and noticing what appeared to be an unrestrained child's head pop into view in the rear seat of the vehicle. He acted under the authority of Kan. Stat. Ann. § 8-1522(a) which provides in part that "a vehicle shall be driven as nearly as practicable entirely within a single lane [of traffic]" and Kan. Stat. Ann. § 8-1344 which instructs:

> Every driver . . . who transports a child under the age of 14 years in a passenger car . . . shall provide for the protection of such child by properly using:
>
> (a) For a child under the age of four years a child passenger safety restraining system . . . ; or
>
> (b) for a child four years of age but under the age of 14, a safety belt . . . .

These two statutes authorized the officer's stop at its inception.

As to the factual scenario of the traffic stop, the district court found that the officer did, in fact, observe Ms. Griego's sedan travel onto the left shoulder "on two occasions in a short distance" and also "noticed a child's head pop into view in the rear window." App. at 88 (Memo. & Order at 2). Defendant disputes the district court's findings on these two facts by contrasting the officer's testimony at the evidentiary hearing with his incident report and the videotape of the stop. Defendant asserts that the officer's testimony at the evidentiary hearing that Ms. Griego crossed the lane marker "[a] couple of times," id. at 22, is inconsistent with both the report which does not indicate a number of times and

-6-

his explanation to Ms. Griego on videotape that she crossed the line marker several times. See Appellant's Opening Br. at 16. Defendant also claims that the rear window of the car was too dirty and tinted for an officer to see or distinguish a child's head or otherwise observe a child seat belt violation from outside the sedan.

On the first point, we do not believe Defendant has established an inconsistency in the officer's testimony. The officer's testimony that Ms. Griego crossed the fog line a couple of times and his explanation to her during the stop that she crossed the line several times are not inconsistent with each other or with the district court's conclusion that the sedan Ms. Griego was driving crossed the line onto the shoulder on two occasions in a short distance. Even if the incident report could be read to imply that Ms. Griego drove off onto the shoulder only once, it is not enough to make the district court's finding clearly erroneous. See Appellee's Br., Attach. 1 at 1. As to the assertion that the rear window was too dirty and tinted for the officer to observe a child bouncing around in the rear seat of the car, we have reviewed the videotape of the traffic stop and conclude that one could distinguish the form and motion of a child's head through the rear window. The district court's findings of fact on both points are not clearly erroneous.

Defendant challenges the probable cause of the traffic stop arguing that Ms.

Griego's driving onto the shoulder for a brief period did not constitute a violation of a traffic statute or probable cause for the stop, especially given the windy weather conditions and the fact that Ms. Griego told the officer that she swerved to avoid the officer's patrol car parked on the right side of the highway. To support this contention, Defendant cites a number of cases which recognize that a driver may deviate from her lane for good cause without violating the law. See, e.g., United States v. Ochoa, 4 F.Supp.2d 1007, 1011-12 & n.4 (D. Kan. 1998) (holding that a single crossing onto the shoulder did not violate Kansas law where the government presented no evidence of weather and road conditions, traffic was heavier than the government attested, and the driver of the car may have been distracted by the patrol car and another vehicle following too close).

In United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999), we held:

> [W]hen an officer merely observes someone drive a vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation. The use of the phrase 'as nearly as practicable' in [Kan. Stat. Ann. § 8-1522] precludes such absolute standards, and requires a fact-specific inquiry to assess whether an officer has probable cause to believe a violation has occurred.

In that case, we concluded that the officer had probable cause to stop a motor home when he saw the vehicle "drift onto the shoulder [of the road] twice within

a quarter mile under optimal road, weather, and traffic conditions." Id.[2]  In an attempt to distinguish this case from Ozbirn, Defendant directs our attention to two cases in which windy conditions contributed to the courts' conclusions that the defendants did not violate traffic laws even though their vehicles drifted out of the lane of traffic at least once.  See, e.g., United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996); State v. Bello, 871 P.2d 584, 587 (Utah Ct. App. 1994).  In both of those cases, however, drivers were stopped while traveling in vehicles that were especially susceptible to the wind.  See Gregory, 79 F.3d at 978; Bello, 871 P.2d at 586.  In Gregory, we also found it significant that the single weaving violation took place over the winding mountainous terrain of Utah.  See Gregory, 79 F.3d at 978.  Here, Ms. Griego crossed onto the shoulder twice in a short distance, in windy and overcast but otherwise ideal driving conditions, on a flat, straight stretch of the Kansas portion of I-70.  Her sedan was not as susceptible to windy conditions as the U-Haul truck in Gregory or the pickup with a camper shell in Bello.  See, e.g., Bello, 817 P.2d at 587 (applying a Utah statute similar to Kan. Stat. Ann. § 8-1522 and concluding that the officer's stop was without probable cause in part that because the camper shell on the pickup truck that defendant was driving "caused it to catch the wind more easily

_____

[2]The record indicated that "the weather was sunny and not unusually windy, and the road was smooth and dry with only a gentle curve and slight uphill grade."  Ozbirn, 189 F.3d at 1198.

than other vehicles").[3] We conclude that the windy weather conditions alone in this case do not distinguish it from Ozbirn.

Defendant also argues that Ms. Griego moved left to avoid the officer and, therefore, did not violate § 8-1522 because, as in Ochoa, the officer caused her weaving onto the shoulder. See Ochoa, 4 F.Supp.2d at 1012 ( holding that the officers caused or contributed to the traffic violation by positioning their vehicle in such a manner as to "startle[]" the defendant into crossing onto the shoulder). In the case at hand, however, the officer was standing at the far right shoulder of the highway along a long, straight stretch. There was an entire empty lane between where he was standing and the lane in which Ms. Griego was traveling when she drifted onto the left shoulder at least twice while approaching him. These considerations are enough to distinguish this case from Ochoa. We hold that the officer acted reasonably with probable cause when he stopped the sedan driven by Ms. Griego for violating § 8-1522.

Further challenging probable cause, Defendant contends that the officer fabricated the seat belt violation. See Appellant's Opening Br. at 25 (citing Villa-Chaparro, 115 F.3d at 801, for the implicit proposition that an officer might

---

[3]The court indicated that "the fact that in the two miles that [the officer] followed [defendant] he observed no further weaving" also led it to conclude that the single instance of weaving could not serve as a constitutional basis for the stop. See Bello, 871 P.2d at 587.

-10-

fabricate a seat belt violation in order to justify a stop). Defendant claims that because the officer testified that he "noticed" the child in the back seat *after* he made the stop, App. at 23, he presumably made up the part about observing a child's head pop up in the back seat *prior* to initializing the stop. We held above that the district court did not clearly err in determining that the officer could have observed a child's head pop up in the back seat prior to stopping the vehicle. The district court concluded, in fact, that was the case, and we see no reason to disturb its finding. We conclude that the additional violation of Kansas law requiring child safety restraint provided the officer with additional probable cause to justify the traffic stop of Ms. Griego and Defendant.

## II.

Defendant argues that even if the officer was initially justified in stopping the sedan, he subsequently violated Defendant's Fourth Amendment rights when he detained Defendant beyond the permissible scope of the initial detention.[4] We

---

[4]The district court raised some question as to whether Defendant's status as a passenger of the vehicle qualifies him as being detained prior to his actual arrest. The law of our circuit recognizes that "[d]rivers and passengers have similar interests in seeing that their persons remain free from unreasonable seizure." United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989). The Supreme Court has noted that a "traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." Berkemer v. McCarty, 468 U.S. 420, 436 (1984). Regarding Defendant's

(continued...)

-11-

outlined our standard for analyzing the scope of an investigative detention in

United States v. Jones, 44 F.3d 860, 871-72 (10th Cir. 1995).  We held that "[t]o

determine the validity of a roadside detention, we balance the intrusion on Fourth

Amendment rights against the importance of the government interests involved."

Id. at 871 (citing United States v. Arango, 912 F.2d 441, 446 (10th Cir. 1990)).

We explained:

> An ordinary traffic stop is a limited seizure and is more like an
> investigative Terry stop than a custodial arrest.  We therefore assess
> the reasonableness of traffic stops under the principles set forth in
> Terry v. Ohio, 392 U.S. 1 (1968).  Under Terry, the actions of the
> police must be justified at their inception and reasonably related to
> the circumstances which originally justified their interference.  Id. at
> 20.

Jones, 44 F.3d 871-72 (citations omitted).

---

[4](...continued)
detention as a passenger in the car, we are persuaded by the analysis of the First
Circuit:

> When a police officer effects an investigatory stop of a vehicle, *all*
> occupants of that vehicle are subjected to a seizure, as defined by the
> Fourth Amendment.  The fact that a defendant is a passenger in a
> vehicle as opposed to the driver is a distinction of no consequence in
> this context.  The interest in freedom of movement and the interest in
> being free from fear and surprise are personal to all occupants of the
> vehicle, and an individual's interest is not diminished simply because
> he is a passenger as opposed to the driver when the stop occurred.

United States v. Kimball, 25 F.3d 1, 5 (1st Cir. 1994).  We hold that the detention
of Defendant as a passenger of the car driven by Ms. Griego entitled him to
Fourth Amendment protection even prior to his actual arrest.

It is well established that "[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." Hunnicutt, 135 F.3d at 1349. The officer may inquire about "travel plans . . . and the ownership of the car." United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989). He also may request a driver's license or other form of identification from the passenger. Cf. Florida v. Royer, 460 U.S. 491, 501 (1983) (noting that a request for identification was permissible in and of itself). The officer may even order a passenger to exit the vehicle "pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997). However, after the driver produces "a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way without being subject to further delay by police for additional questioning." United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996) (citations omitted). This rule is subject to two exceptions that permit further questioning: "First, the officer may detain the driver for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. Second, further questioning is permissible if the initial detention has become a consensual encounter." United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994) (citation omitted).

The officer in this case did not assert a reasonable and articulable suspicion

-13-

for extending the scope of the traffic stop or searching the car. With regard to Ms. Griego's detention, the officer explained that Ms. Griego's demeanor and her ambiguous and inconsistent story for her and Defendant's journey across the country led him to request permission from her to submit to further questioning. Ms. Griego gave the officer her permission. There is no evidence that the officer constrained Ms. Griego by any coercive show of authority. For this reason and because the officer returned Ms. Griego's documents to her before requesting her permission for further questioning, we are persuaded that Ms. Griego's encounter with the officer became consensual. Cf. id. (referencing the "bright-line rule" in our circuit that "an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him"); United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999) (holding that officer's encounter with defendant was consensual because officer "did not constrain Defendant by a 'coercive show of authority'").

Nonetheless, the basis for the officer's subsequent search of the vehicle was Defendant's consent. We must consider whether the officer exceeded the scope of Defendant's detention. Because the officer in this case did not articulate any reasonable suspicion of illegal activity, we must determine whether

-14-

Defendant's detention also became a consensual encounter.[5] "A consensual encounter between police and a private citizen occurs when there is voluntary cooperation by the private citizen in response to non-coercive questioning by the police officer." United States v. Morin, 949 F.2d 297, 300 (10th Cir. 1991). The police must not use a "'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'" United States v. Elliot, 107 F.3d 810, 814 (10th Cir. 1997) (quoting United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991)); accord Patten, 183 F.3d at 1194.

In Defendant's evidentiary hearing testimony, he provided an alternative version of the events that took place after the officer finished his questioning of Ms. Griego and approached Defendant in the passenger's seat of the car. That version of events includes testimony that the officer ordered him out of the sedan, opened the trunk, and began searching the vehicle without any semblance of his voluntariness or consent. By reviewing this testimony on appeal, however, Defendant has not persuaded us that the district court's findings on the matter are clearly erroneous, and those findings validate the officer's version of events. Cf.

---

[5]The bright-line rule concerning the return of documents does not apply because the officer did not take any documentation from Defendant.

Patten, 183 F.3d at 1194 (noting that "[t]he question of whether an encounter was consensual 'calls for the refined judgment of the trial court'" (quoting United States v. Werking, 915 F.2d 1404, 1409 (10th Cir. 1990)); compare App. at 91 (Memo. and Order at 5) with id. at 50. The district court concluded that after questioning Ms. Griego the officer approached Defendant on the passenger side of the vehicle, asked him if he and Ms. Griego were carrying anything illegal, and then asked him for consent to search the car. We conclude that Defendant voluntarily cooperated with the officer's non-coercive questioning of him in such a manner as to make their encounter consensual, and, therefore, the officer did not impermissibly exceed the scope of Defendant's detention. We turn now to Defendant's argument that he did not give his consent for the officer to search the vehicle.

### III.

When the government relies on a defendant's consent for the validity of a search, "the government bears the burden of proving that the consent was freely and voluntarily given," a determination that we make by "evaluating the totality of the circumstances." United States v. McRae, 81 F.3d 1528, 1536-37 (10th Cir. 1996). We have developed a two-prong test for determining the voluntariness of a consent to search: The government must (1) "proffer 'clear and positive

testimony that consent was unequivocal and specific and freely and intelligently given'" and (2) "prove that this consent was given without implied or express duress or coercion." Id. at 1537 (citations omitted).

In the case at hand, the officer testified that after Ms. Griego instructed him that he would need to obtain Defendant's consent before searching the car, the officer got out of his police car, approached Defendant in the passenger's seat, and asked Defendant if he was carrying anything illegal in the car. Defendant responded that he was not. The officer then requested Defendant's consent to search the vehicle. Defendant gave his consent, got out of the vehicle, and opened the trunk. The officer then began searching the trunk and the rest of the car. See App. at 31-32.

Our review of the officer's testimony demonstrates that the government met its burden of proffering clear and positive testimony of Defendant's voluntary consent. We again acknowledge that Defendant provided a version of events that differed from the officer's testimony at the evidentiary hearing. The district court, however, weighed the credibility of the witnesses and found that the officer's testimony was more credible. In this case, Defendant had not given any documents to the officer which need to be returned, and he was not otherwise under any duress when he consented to the search of the car. Only one officer was present at the time consent was given, see id. at 51, and there is no evidence

or allegation that the officer displayed a weapon or physically touched Defendant. Cf. United States v. Pena, 143 F.3d 1363, 1367 (10th Cir.) (holding that to "determin[e] whether a consent to search was free from coercion, 'a court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances'" (citation omitted)), cert. denied, 525 U.S. 903 (1998). Under these circumstances, we hold that the district court did not clearly err in finding that Defendant voluntarily consented to the search of the vehicle. We hold further that the search of the car was reasonable and did not violate Defendant's Fourth Amendment rights. The district court did not err in denying Defendant's motions to suppress.

AFFIRMED.

Entered for the Court


Monroe G. McKay
Circuit Judge