**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James E. MEYER, Defendant–**
**Appellant.**

No. 01–3022.

United States Court of Appeals,
Tenth Circuit.

Oct. 10, 2001.

Before KELLY and STEPHEN H. ANDERSON, Circuit Judges, and STAGG,* District Judge.

* The Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

810

ORDER AND JUDGMENT **

STEPHEN H. ANDERSON, Circuit Judge.

Defendant James Meyer entered a conditional plea of guilty to possession with intent to distribute approximately 293 pounds of marijuana, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2, reserving for appeal the issue of whether the district court erred in denying his motion to suppress. Meyer was sentenced to sixty months imprisonment and assessed $100 in costs. We affirm the denial of this motion to suppress and affirm Meyer's conviction and sentence.

BACKGROUND

On March 20, 2000, at approximately 3:00 p.m., Kansas Highway Patrol Troopers John Rule and Rich Jimerson observed a vehicle with Colorado license plates driven by Meyer traveling eastbound on Interstate 70. The troopers noted that the vehicle's rear was sagging, as if heavily loaded, which caused them to follow the vehicle. While following Meyer's car, the troopers observed the car travel twice slightly past the lane marker on the shoulder of the road, and then drift toward the center line of the road. Trooper Rule turned on his emergency lights and stopped Meyer's vehicle for failing to drive his vehicle within a single lane, in violation of Kan. Stat. Ann. § 8–1522. The emergency lights activated the patrol car video camera and recorder.

When Trooper Rule approached the car, he observed Meyer was driving the vehicle and Michael Hayes was in the passenger seat. Trooper Rule testified at the sup-

pression hearing that, when he first began questioning Meyer, he detected a very strong odor of air freshener coming from the car. The trooper described it as the strongest odor he had ever smelled coming from a vehicle. Trooper Rule also testified that, during his entire interchange with Meyer, Meyer appeared very nervous, with visibly shaking hands, more than the trooper saw in most traffic stops.

As the district court noted, most of the conversation between Trooper Rule and Meyer is audible on the tape which recorded the stop.[1] Trooper Rule asked to see Meyer's driver's license and explained that he had stopped the car because it had been drifting, and he asked if Meyer was sleepy. Meyer stated that he was not too tired, but that he had lenses (presumably contacts) which were "fuzzy" or "funky" and he was not used to them.

After noticing that both Meyer and Hayes were wearing ties, and because there were blueprints in the back window of the car, a business card visible near the front windshield, and a briefcase visible in the back seat, Trooper Rule asked Meyer and Hayes if they were working. Meyer responded that they were on their way to the Hilton in Kansas City. When asked where they were coming from, Meyer said they were traveling from Colorado Springs to attend a software conference.

Trooper Rule returned to his patrol car and checked Meyer's license, which was valid. The trooper then walked back to Meyer's side of the car and asked whether another car, a Volvo also with Colorado plates, was traveling with them. Meyer responded in the negative. Trooper Rule

** This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order

and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

1. We have also reviewed the video tape, and conclude that the district court's factual findings are amply supported by the tape.

then returned Meyer's license to him and handed him a warning citation. Meyer asked whether he had really been drifting, and the trooper assured him that he had. Trooper Rule told Meyer and Hayes to have a good trip.

The trooper then asked if they would mind if he asked them a few more questions. Meyer responded, "Excuse me?" Trooper Rule again asked if they would mind if he asked them a few more questions. The trooper testified that "[h]e agreed, nodded his head, yes, I believe." Tr. of Suppression Mot. Proceedings at 15, Appellant's App. at G–77. The district court described in detail the following conversation:

> Rule asked something to the effect of "Coming from Colorado Springs, you guys didn't bring anything illegal, did you, no guns, drugs, large amounts of money, anything like that?" Meyer said, "No, No, sir." Rule said, "Could I take a look in your trunk, would that be okay?" Meyer said, "In my trunk?" Rule said, "yeah." Meyer then paused and asked, "Well what for?" Rule said, "Okay. You're not carrying anything illegal with you." Meyer responded, "That's right." Rule continued, "Okay. We get a lot of illegal stuff coming out of the Colorado Springs area." Meyer interjected, "I understand that, sir, I— absolutely not, I'm not carrying anything illegal." Rule said, "Okay. So can I take a look in your trunk?" Meyer may have said "Well" and then said, "I don't understand why though." Rule said, "Okay. So you don't want me to?" Meyer responded that, "It's not that I don't want you to" and then said that his father was an officer and that he understood his rights. Rule said that he was not asking to violate Meyer's rights, that he was just asking if he could take a look in the trunk. Meyer then recounted a rather lengthy story about how he

> had been through this before a long time ago in New Mexico, when he had been with his mother, and some officers had searched through their belongings and some of their clothes were scattered around and destroyed. Rule said that he wasn't going to go through their clothes, he just wanted to look in the trunk. Meyer said, "Well, officer," Rule said, "You don't want me to, is that what you're telling me?" Meyer said, "Well, it's not that I don't want you to, it's just that I don't understand it."

> Rule said, "Well, I'll tell you what I'm seeing right now. Okay? There's a very strong odor of air freshener coming from your vehicle right now. Okay? That smells to me like it possibly could be a masking agent for some kind of drug." He further indicated he thought the fact that they were supposedly going to a conference and were wearing ties for 700 miles on the highway was very unusual. Meyer or Hayes said that he always wears a tie. Rule said, "Okay. Do you not want me to look in the trunk?" Meyer said, "I—I just know my rights" and added, "If you don't mind, I respectfully decline." Rule said, "All right. Is it okay with you then if I just walk my dog around your car?" Meyer immediately responded, "I don't care." Rule then said to the defendants, "Why don't you guys step out here for me, okay?" as he opened up the driver's door and motioned Meyer toward the side of the road.

Mem. and Order at 4–6, Appellant's App. at B–14–B–16 (footnotes omitted). At Trooper Rule's request, Meyer and Hayes got out of the car. Our review of the videotape confirms that the district court's factual findings relating to the stop were not clearly erroneous.

Trooper Rule then got his drug-sniffing dog, Kilo, out of his patrol car and walked him counter-clockwise around Meyer's car.[2] The district court found that "from the testimony at the hearing and from the videotape ... the dog appeared to show some interest (characterized by Rule as a 'behavior change') in the driver's side rear wheel or fender area." *Id.* at B 17. Kilo repeated this behavior twice more. Then Trooper Rule got down on his hands and knees and pointed under the car, and Kilo sniffed under the car. Trooper Rule testified at the suppression hearing that Kilo indicated by scratching the underside of the car. The trooper then told Meyer to give him his car keys because the dog had alerted on the car. When he opened the trunk, Trooper Rule saw the marijuana in plain view.

The district court denied Meyer's motion to suppress. Meyer conditionally pleaded guilty and now appeals that denial. He argues: (1) the district court erred in holding that the initial stop of Meyer's car was valid; (2) the district court erred in holding that, once the initial purpose of the stop was accomplished, the continued detention was justified by Trooper Rule's reasonable and articulable suspicion that Meyer was involved in criminal activity; and (3) because Meyer was being illegally detained at the time he consented to the walk-around by Kilo, the evidence seized as a result of the walk-around must be suppressed.

## DISCUSSION

When we review an order denying a motion to suppress, "we accept the district court's factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the district court's determination." *United States v. Caro,* 248 F.3d 1240, 1243 (10th Cir.2001). Moreover, credibility determinations, " 'and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge.' " *Id.* (quoting *United States v. Fernandez,* 18 F.3d 874, 876 (10th Cir.1994)). However, we review de novo the ultimate determination of reasonableness under the Fourth Amendment. *Id.*

■ " 'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.' " *United States v. Holt,* 264 F.3d 1215, 2001 WL 1013251 at *3 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt,* 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)). We apply the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. 1868.

### I. Validity of Initial Stop

■ Turning to the first inquiry, the validity of the initial stop, our cases "establish that a traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred ... or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' " *United States v. Ozbirn,* 189 F.3d

---

**2.** Kilo is Trooper Rule's drug detection dog, who usually accompanies the trooper on patrol. Trooper Rule is a trained and certified K–9 handler. Both he and Kilo are re-certified annually.

1194, 1197 (quoting *United States v. Botero Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc) (further quotations and citations omitted)). *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that detention of a motorist supported by probable cause to believe the motorist committed a traffic violation is reasonable under the Fourth Amendment). The officer's subjective intentions and motivations are irrelevant. *Id.* at 813, 116 S.Ct. 1769.

■ Meyer argues the initial stop of his vehicle was not justified because (1) even if he momentarily drifted onto the shoulder of the road, "a traffic stop based upon a momentary drift is not justified under clearly established case law, and (2) there is no evidence the movement was unsafe and endangered defendant, defendant's vehicle or any other person or object, which element (unsafe movement) is required under K.S.A. 8–1522." Appellant's Br. at 14–15. Meyer relies upon *United States v. Gregory,* 79 F.3d 973, 978 (10th Cir .1996) and *United States v. Ochoa,* 4 F.Supp.2d 1007, 1011 (D.Kan.1998).

The district court found the troopers' testimony that Meyer's car twice crossed over the lane marker was credible and concluded that the officers had probable cause to believe that Meyer had violated § 8–1522. Although Meyer testified at the suppression hearing that he did not pass over the lane marker, we do not review the credibility determinations of the district court. Accordingly, we affirm the district court's finding that the troopers observed Meyer's car twice drift out of its lane.

Meyer next argues that, even if he drifted over the lane briefly, that is insufficient to establish a violation of § 8–1522 and, therefore, insufficient to justify the traffic stop based upon an observed violation of a traffic law. Kan. Stat. Ann. § 8–1522 provides that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic ... [a] vehicle shall be driven as nearly as practicable entirely within a single lane." Meyer relies primarily on *Gregory* and *Ochoa* for this argument.

In *Gregory,* we held that "an isolated incident of a vehicle crossing into the emergency lane of a roadway" was not a violation of applicable state law justifying a stop. *Gregory,* 79 F.3d at 978. *Ochoa* relied upon *Gregory* to similarly hold that a single instance of drifting into the emergency lane did not provide probable cause to stop a vehicle. 4 F.Supp.2d at 1011–12. We have since recognized that *Gregory* does not announce any bright-line rule applicable to all traffic stops: "decisions like *Gregory* do not establish an absolute standard or bright-line rule regarding what conduct constitutes a violation of statutes like Kan. Stat. Ann. § 8–1522, but instead highlight the need to analyze objectively all the surrounding facts and circumstances to determine whether the officer had the probable cause necessary to justify the stop." *United States v. Ozbirn,* 189 F.3d 1194, 1198 (10th Cir.1999). Considering all the facts and circumstances in this case, including that: (1) unlike in *Gregory,* the road and weather conditions were optimal; (2) Meyer drifted across the lane twice, not just once; and (3) unlike the factual situation in *Ochoa,* where the court found a single crossing onto the shoulder did not constitute a violation of § 8–1522, there is *no* suggestion here that the officers contributed to Meyer's drifting onto the shoulder, we affirm the district court's conclusion that the troopers had probable cause to stop Meyer's vehicle for an observed traffic violation. *See Ozbirn,* 189

F.3d at 1198–99.[3] We therefore affirm the district court's conclusion that the troopers' initial stop of Meyer's vehicle was reasonable under the Fourth Amendment.

## II. Validity of Detention

■ Having determined that the initial stop was valid, we now consider whether the entire stop was reasonable—"whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Holt*, 264 F.3d 1215, 1220 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). As indicated above, and as the district court correctly found, Trooper Rule returned Meyer's driver's license after issuing him a warning, and wished Meyer and Hayes a good trip. However, he immediately asked Meyer if he could ask him a few questions.

■ "When a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning." *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999). Two established exceptions to this general rule permit further questioning if "(1) the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to further questioning." *Id.*

The district court first held that Meyer voluntarily consented to the questioning:

after Trooper Rule returned Meyer's license and gave him a warning citation, Meyer initially voluntarily consented to further questioning by the officer. The totality of the circumstances leads the court to conclude that Meyer's consent was voluntary. Regardless of the fact that Meyer undoubtedly did not want to stay and talk, the fact is that he chose to do so, and there is no evidence that Rule employed official coercion or intimidation to overcome Meyer's ability to make a free and deliberate choice.

Mem. and Order at 10, Appellant's App. at B–20. Meyer argues that the district court overlooked two circumstances which undermine the conclusion that he consented to the further questioning: (1) during the interchange between Meyer and Trooper Rule, Meyer specifically declined permission to search the trunk of his car several times; and (2) for part of the interchange, the trooper had his hand on Meyer's windshield and, at one point, leaned his head almost into the window, thereby, according to Meyer, "subtlely, but effectively, conveying to defendant he could not leave because the officer had not released him." Appellant's Br. at 15.

■ "In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules." *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997). Rather, we must consider "the totality of the circumstances in a particular case." *Id.* at 814 (citing *Ohio v. Robinette*, 519 U.S. 33, 39,

---

**3.** Meyer also refers us to *United States v. Freeman*, 209 F.3d 464, 468 (6th Cir.2000), in which, citing *Gregory*, the court held that a single instance of a large motor home briefly drifting into the emergency lane did not justify a traffic stop. That case is factually distinguishable from the instant case.

With respect to Meyer's argument that there is an "unsafe movement" element in § 8–1522, he provides no support for that argument. Further, our decisions in *Ozbirn* and *Gregory* state that the statutory phrase "as nearly as practicable" precludes "absolute standards," but rather requires the kind of "fact-specific inquiry" we have conducted in this case. *Ozbirn*, 189 F.3d at 1198.

117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, we have acknowledged it "is not always sufficient to demonstrate that an encounter becomes consensual." *Elliott,* 107 F.3d at 814; *see also Gregory,* 79 F.3d at 979. Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.' " *Elliott,* 107 F.3d at 814 (quoting *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991)). We have also observed, in dicta, that an officer leaning on a car may support a finding of a coercive show of authority. *See Elliott,* 107 F.3d at 814. However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993). Given the totality of the circumstances in this case (no display of a weapon, non-threatening tone of voice, no physical touching of Meyer) we conclude that Trooper Rule's placement of his hand and/or forearm briefly on Meyer's windshield did not render the encounter non-consensual. *Cf. United States v. West,* 219 F.3d 1171, 1177 (10th Cir.2000) (holding that there was no unlawful detention even though officer stood "extremely close to [defendant's] car and lean[ed] forward so that the car door could not open without hitting [the officer]").[4]

The district court also held that "at the time Rule began to question the defendants about whether they were carrying anything illegal, the facts known to the trooper supported a reasonable suspicion of criminal activity that justified a brief investigative detention." Mem. and Order at 10–11, Appellant's App. at B–20–B–21. The court based this conclusion on Trooper Rule's testimony, which the court specifically found credible, that he smelled a strong odor of air freshener in Meyer's car, along with both troopers' observation that the trunk of the car sagged down as if heavily loaded, and Trooper Rule's observation that Meyer appeared unusually nervous during their encounter. *Id.* at B–21–B–22. Trooper Rule was aware of these circumstances from the beginning of his encounter with Meyer.

We affirm the district court's conclusion that the combination of those factors supported a reasonable suspicion of criminal activity. "The Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis." *West,* 219 F.3d at 1179 (citations omitted). Furthermore, "[a]lthough normal nervousness exhibited by those stopped for a traffic citation is usually entitled to limited significance in the probable cause analysis, ... extreme and continued nervousness" is entitled to more weight. *Id.* Finally, the fact that the car appeared to be heavily loaded can contribute to a reasonable suspicion

---

4. The district court also found that, immediately after Meyer consented to the dog sniff, Trooper Rule opened the car door and effectively "ordered" Meyer and Hayes out of the car. Mem. and Order at 12–13, Appellant's App. at B–22–B–23. The court concluded that this amounted to a seizure of the two men. *Id.* However, in view of its conclusion that Trooper Rule had, at that time, reasonable suspicion justifying a detention, the seizure was lawful. *Id.* As we discuss, *infra,* we agree with the district court that, at the time Trooper Rule ordered Meyer and Hayes out of the car, he had reasonable and articulable suspicion justifying their detention.

supporting a stop and brief investigation. *See United States v. Sharpe,* 470 U.S. 675, 683 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (noting that one of the facts giving rise to reasonable suspicion to stop a truck was that it "appeared to be heavily loaded"). Viewed collectively, those factors would give an experienced officer reasonable articulable suspicion that Meyer was engaged in criminal activity and justify the brief continued detention. Thus, even were we to conclude that the encounter was non-consensual, or became non-consensual, we would find that Trooper Rule's brief detention of Meyer, including his seizure of him when he ordered him out of his car, was permissible.

### III. Validity of Consent to Dog Sniff

Meyer's final argument appears to be that his consent to having Kilo walk around his car was rendered involuntary by the fact that he was being unlawfully detained at the time he gave that consent. He further appears to concede that the resolution of this issue is controlled by our resolution of the first two issues. Since we have affirmed the district court's conclusion that the stop and detention were valid, Meyer's third argument fails.

### CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Meyer's motion to suppress and AFFIRM his conviction and sentence.