**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 14, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHELLA DELANTE COULTER,

Defendant - Appellant.

No. 11-6078
(D.C. No. 5:10-CR-00312-HE-1)
(W.D. Okla.)

**ORDER AND JUDGMENT***

Before **MURPHY**, **GORSUCH**, and **HOLMES**, Circuit Judges.

This case began with a stake out. Detectives Phil Williams and Josh
Herren had their eye on a particular house in Oklahoma City. Because the house
sat on a cul de sac, the detectives risked being noticed if they parked their
unmarked pickup on the street. So they cruised through the neighborhood,
periodically checking on their target.

But the real trouble began down the street when a neighbor, Shella Coulter,
noticed the truck pass his house repeatedly. Mr. Coulter was standing outside,

---

* This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

talking on his cell phone. During one of the detectives' passes, Mr. Coulter threw up his arms as though gesturing to the detectives, cocked his head sideways at them, and slapped his chest. Another time, the detectives saw a woman walk out of the house and talk to Mr. Coulter. Still another time, Mr. Coulter stepped out almost into the street and leaned into it with his arms out, as if he were flagging down the truck.

That's when the detectives stopped to investigate. As they got out of their truck, they told Mr. Coulter they were police detectives (their badges were visible) and asked what he wanted by his gestures. Though still talking on his phone, Mr. Coulter paused to respond, "I don't have to talk to you." When the detectives asked for identification, Mr. Coulter repeated that he didn't have to speak with them. The detectives then asked Mr. Coulter to finish his phone call, but Mr. Coulter disregarded the request. When Detective Herren reached out to grab the phone, Mr. Coulter drew back his arm. Worried Mr. Coulter might be trying to hit him, Detective Herren grabbed Mr. Coulter's arm, swept his legs out from under him, took him to the ground, and handcuffed him.

At this point and concerned for their safety, the detectives asked if there was anyone in the house. Mr. Coulter replied that his girlfriend was. Detective Williams knocked at the door, and Lori Silva, the woman the detectives had seen earlier, came outside. At first verbally aggressive, Ms. Silva eventually calmed down. Detective Williams asked for identification and Ms. Silva replied that she

-2-

had some, but it was in the house. As she made a move for the front door, Detective Williams explained that he didn't want her to go in the house alone. The Detective testified that he harbored officer safety concerns about allowing Ms. Silva to go inside unescorted, worried that she might try to retrieve a weapon. Ms. Silva looked back at the officer but kept walking toward the house. When she gave no indication that he could not follow her, Detective Williams did just that. The detective went as far as the inside of the doorway to watch as she fetched her identification.

That's when he noticed something. About ten feet away, and visible from the doorway where he stood, Detective Williams saw marijuana lying on an ottoman next to the purse that held Ms. Silva's identification. The detective retrieved the drugs and, later, Ms. Silva signed a search waiver allowing the detectives to conduct a full search of the house. That search turned up more drugs and a gun.

And that, in turn, led to Mr. Coulter's arrest for unlawfully possessing a gun, given his prior felony conviction. In the district court, Mr. Coulter moved to suppress the gun as the product of an unconstitutional search and seizure. But the court denied the motion, and when it did Mr. Coulter decided to plead guilty, though in doing so he reserved the right to appeal the adverse ruling on his suppression motion.

Now on appeal, Mr. Coulter begins by arguing that the gun should be suppressed because its discovery was the fruit of an unlawful detention. Mr. Coulter acknowledges that normally "police officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures." *United States v. Esparza-Mendoza*, 386 F.3d 953, 958 (10th Cir. 2004) (quotation omitted), cited in Appellant Br. at 11. But, he says, the encounter in this case quickly became constitutionally problematic when the detectives insisted on speaking with him after he refused their inquiries and then grabbed him, took him to the ground, and handcuffed him. And because the encounter became unlawful by this point, he argues, everything that was discovered later must be suppressed.

Even assuming (without deciding) that the detectives exceeded constitutional limits in detaining him as Mr. Coulter claims, it doesn't follow that their detention set in motion the chain of events that led the officers to the gun. It is axiomatic that "[s]uppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity." *Segura v. United States*, 468 U.S. 796, 815 (1984) (quotation omitted). To warrant suppression, a defendant must not only show illegal governmental conduct, but a "nexus" between the illegality and the challenged evidence. *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001). That nexus requires "at minimum" a showing by the moving party of "but for" causation. *Id.*

And here we cannot say Mr. Coulter has demonstrated that "but for" his detention the weapon inside his house would have remained undiscovered. To the contrary, from the moment Mr. Coulter refused to speak with them it was clear that the detectives would knock on the door and attempt to talk with someone at the residence — and thus undertake the same steps that ultimately yielded the gun. Mr. Coulter flagged down their truck in a manner that suggested either a need for help or a wish for confrontation. This behavior, coupled with his refusal to explain it and the observation of a woman exiting the house earlier, would have led reasonable officers to see if anyone was home. Officers are "expected . . . through preventative patrol and other measures, [to] aid individuals who are in danger[,] . . . resolve conflict, . . . and provide other services on an emergency basis." 3 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 6.6 (4th ed. 2011) (internal quotation marks omitted). If it turned out Mr. Coulter was seeking aid but clammed up upon learning he had flagged down police, the detectives would understandably want to ensure that anyone inside the house was safe. *See United States v. Garner*, 416 F.3d 1208, 1214 (10th Cir. 2005) (officers lawfully investigated safety of individual reported to be unconscious in a field). Similarly, if Mr. Coulter was trying to instigate a confrontation, the officers had reason to make sure no one was inside who might serve as Mr. Coulter's back up while they resolved the conflict. In either case, the detectives' decision to knock on Mr. Coulter's door was a common sense

-5-

reaction to an ambiguous encounter, and one whose ambiguity was created by Mr. Coulter's refusal to explain himself, not his detention. *See United States v. Nava-Ramirez*, 210 F.3d 1128, 1131-32 (10th Cir. 2000) (analyzing whether without the alleged illegality, the officers still would have conducted the relevant search). To be sure, after being handcuffed Mr. Coulter told the detectives that his girlfriend was in the house. But the detectives had already seen a woman on the premises, and we cannot see how the statement by Mr. Coulter confirming as much *caused* the investigation to continue to his door.

That leaves Mr. Coulter to argue there was something constitutionally improper about the detectives' interaction with Ms. Silva. Mr. Coulter makes an effort in this direction but it is a limited one. He doesn't challenge what Detective Williams did once he saw drugs in plain view on the ottoman during his original entry. He doesn't challenge the later search conducted pursuant to Ms. Silva's written consent. Instead, he challenges only the lawfulness of Detective Williams's initial steps through the doorway. This entry, Mr. Coulter says, was taken without a warrant or lawful consent. And it flows from this, he argues, that everything discovered after this point must be suppressed.

The district court disagreed, however, and so do we. A warrantless search may be consistent with the Fourth Amendment if it is consensual and the consent is freely given by someone with actual or apparent authority over the premises. *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). This consent does

not have to be verbal but can be based — in appropriate cases — on a party's "silence and acquiescence." *Id.* And we agree with the district court that this is such a case.

It is because, as the district court explained, "a reasonable person would have understood by Ms. Silva's action that the officer could follow her into the residence." D.Ct. Op. at 8. After Detective Williams asked to see her identification, Ms. Silva told him it was inside the house and walked toward the door. When Detective Williams explained that he did not want her to go inside the house alone for officer safety reasons, Ms. Silva simply looked at him and continued to the house. The detective followed and Ms. Silva did not object as he stepped through the doorway to watch her. Our cases have already found voluntary consent on facts analogous to these. *See Patten*, 183 F.3d at 1194-95; *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999); *United States v. Malady*, 209 F. App'x 848, 851-52 (10th Cir. 2006). We fail to see any way we might faithfully distinguish our prior implied consent cases and reach a different result here. Neither can we say that reasonable officers would have taken Ms. Silva to believe she had no choice in the matter, and thus was only submitting to their show of authority instead of freely consenting. *See United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007). None of the usual indicia of coercion was present here, *see id.* at 790, and the officers could reasonably conclude that if Ms. Silva did not want Detective Williams following her she

would have either said so or declined to retrieve her identification. *See Gordon*,
173 F.3d at 766.

Once lawfully across the threshold, no one disputes the scope of Detective
Williams's intrusion or the lawfulness of Ms. Silva's subsequent written consent
for a further search. Accordingly, it follows that the discovery of more drugs and
the gun was lawful and the judgment of the district court must be, and is,
affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge