UNITED STATES of America, Plaintiff,

v.

Omayra RIVERA, Defendant.

No. 02–40137–01–JAR.

United States District Court, D. Kansas.

Oct. 8, 2003.

**1300**

Michael S. Holland, Holland & Holland, Russell, KS, for Defendant.

Anthony W. Mattivi, Office of United States Attorney, Topeka, KS, for Plaintiff.

## Memorandum Order and Opinion Denying Motion to Suppress

ROBINSON, District Judge.

This comes before the Court on Defendant Omayra Rivera's Motion to Suppress (Doc. 28) evidence seized in a traffic stop of a vehicle driven by her. For the following reasons, the motion is denied.

### Facts

On the morning of October 21, 2002, Kansas Highway Patrol Trooper J.D. Rule was patrolling Interstate 70 in Ellis County, Kansas, between mileposts 156 and 157. Defendant Omayra Rivera was driving eastbound on Interstate 70 in a Hyundai. Trooper Rule first observed the Hyundai as he was turning around in the median in order to head eastbound. The Hyundai did not appear to be speeding or driving erratically. However, the Hyundai and an eastbound, red Honda, four to five car lengths in front of the Hyundai, caught Trooper Rule's attention, as they appeared to be traveling together. In his years of patrol, narcotics interdiction and K–9 policing experience,[1] Trooper Rule has determined that a vehicle transporting narcotics is sometimes accompanied by an "escort" vehicle. Trooper Rule testified that on Interstate 70, it is not uncommon for persons not involved in transporting narcotics to also be traveling in tandem, in more than one vehicle.

After the Hyundai passed his patrol car, Trooper Rule, traveling in the left lane, passed the Hyundai and pulled parallel to the red Honda. Rule requested dispatch to run a check on the Honda's license tag. Rule testified that he decided to check on the identity of the owner of the Honda, for two reasons. First, in patrol and interdiction activity, if vehicles are traveling together, it is relevant if narcotics or contraband are found in one vehicle. Also, if vehicles are in fact traveling together, Rule likes to know before stopping one vehicle, which may cause the vehicles to separate from each other.

After calling dispatch with the Honda's license tag number, Trooper Rule slowed his vehicle, allowing him to get behind the Hyundai in the right lane. Rule then followed the Hyundai and in short order observed the Hyundai stray onto the right shoulder two times. The Hyundai's right tires strayed about six inches onto the

---

1. Trooper Rule has been an employee of the Kansas Highway Patrol since 1991, and a trooper since 1994. He became a K–9 handler for the highway patrol in 1997. He has personally initiated more than 250 traffic stops involving the interdiction of narcotics or large sums of money. He has been involved in many more in his capacity as a K–9 handler.

shoulder for a couple of seconds, moved back fully into the lane for a few seconds, then for a second time strayed about six inches onto the shoulder for a couple of seconds before moving back fully into the lane. Trooper Rule testified that because there were no vehicles parked on the shoulder, the Hyundai's movements did not present an actual risk of collision with another vehicle.

However, Trooper Rule was concerned that the driver might be sleepy or impaired. Because the weather was nice, and there was but a slight breeze that should not affect a low profile car like the Hyundai, Trooper Rule decided to check on the driver. So, Trooper Rule effected a traffic stop of the Hyundai. As he did, he noticed that the Honda did not stop, as tandem travelers sometimes do, when one of the vehicles is stopped.

Trooper Rule made contact with the driver of the Hyundai, defendant Omayra Rivera.[2] He asked for her driver's license and told her he had stopped her because she had drifted over the lane. He also asked her if she was sleepy; Rivera responded no. Rule testified that because he did not detect the odor of alcohol, he did not ask Rivera about drug or alcohol use. Rivera's driver license showed that she resided in Easton, Pennsylvania. Just before Trooper Rule effected the traffic stop of the Hyundai, dispatch had advised him that the red Honda was registered to a man in Easton, Pennsylvania.

Trooper Rule asked Rivera if the Hyundai was hers; Rivera responded that it was not. At Rule's request, Rivera produced the rental agreement for the Hyundai. Rule asked where Rivera was heading; she replied that she was going from Denver to her home in Pennsylvania. Yet, the rental agreement indicated that the car had been rented in Denver and was to be returned in Denver. When Rule asked Rivera about this, Rivera stated that she had permission to return the vehicle in Pennsylvania. Rule testified that this explanation did not alleviate his suspicions.

Rule was suspicious at that point for several reasons other than Rivera's seemingly inconsistent account of her travel plans. First, during his conversation with Rivera, Rule noted that Rivera was extremely nervous. Her hands shook and her voice shook. Rivera made very little eye contact with Rule during this conversation. He also detected a strong odor of air freshener coming from this rental vehicle. Through Rule's considerable interdiction experience he knew that rental vehicles are often used to transport drugs and that air fresheners are often used to mask the odor of the drugs being transported.

Trooper Rule returned to his patrol car and wrote a warning citation for failing to maintain a single lane, a violation of the Kansas traffic laws. After writing the warning citation, Rule returned to Rivera's vehicle and gave her license and rental agreement back to her. He explained that he was issuing her a warning citation, and he told her to have a good trip. Rule then took a step or two away from the vehicle. At this point, Rivera asked Rule a question about the warning citation. Rule answered Rivera's question, and bid her to "have a good trip." From the Court's observation of the video tape of this stop,[3]

---

**2.** On that date, Trooper Rule was aware that Trooper Nollette had seized a large amount of cash in a traffic stop some months prior. However, Trooper Rule was not aware of the details of Trooper Nollette's stop: that on March 16, 2003, Jason Smith had been stopped while driving a black Ford Expedi-

tion registered in the name of Omayra Rivera, and that nearly $100,000 had been found in a hidden compartment attached to the undercarriage of the vehicle.

**3.** Rule's patrol car was equipped with a video camera stationed in the front ceiling area.

at this point, Rule took a couple of steps away from Rivera's car. Rule then stepped back to Rivera's window and politely asked Rivera, "Can I ask you a couple of questions?" Rivera indicated that the trooper could ask her additional questions. Rule then asked Rivera if she was carrying any illegal items including drugs or guns; Rivera responded that she was not.

Rule then asked Rivera for permission to search the trunk of the car. Rivera answered affirmatively and she triggered the trunk release from inside the car. Rule then asked "Is it alright if I search the whole car?" Rivera replied that it was. Rule asked Rivera to exit the car and motioning to the front of the car, asked Rivera to stand over there. Rule was following a standard operating procedure designed to ensure officer safety during a search of a stopped vehicle. Rivera did not refuse, and exited the vehicle as Rule requested. The video tape demonstrates that the exchange was cordial, that Rule used a mild and non-threatening tone of voice, and that Rule never displayed or brandished his firearm. The videotape also documents that more than fifty vehicles drove by between the time of the initial stop and Rivera giving Rule consent to search the vehicle.

Making no other comment, Rule began to search the trunk of the vehicle. Meanwhile, Rivera went and stood next to the vehicle, not in front of the vehicle. From where Rivera stood, she could, and did, observe Rule searching the trunk and the car.

Rule searched two suitcases in the trunk. Both were unlocked; he gained access by unzipping them. Both suitcases contained women's clothing. Relying on his experience, Rule felt the liner of the

suitcase, to detect whether anything was secreted there. Rule felt bundles in the liner; and found two brick like packages of cocaine in one suitcase liner; and found another three brick like packages of cocaine in the liner of the other suitcase. Upon finding the packages, Rule placed Rivera under arrest and Mirandized her. They then had a short conversation in which Rivera denied that she was traveling with the red Honda.

At the suppression hearing, defendant Omayra Rivera testified, disputing Trooper Rule's testimony in several respects. Rivera testified that she was not traveling with the red Honda, did not know the occupants of the red Honda, and did not notice the red Honda until she saw the trooper's patrol car pull up parallel with it. More pertinently, Rivera testified that when Trooper Rule spotted her, she was not directly behind the red Honda; she was following a green Explorer with Missouri tags and there were two to three cars between that Explorer and the red Honda. Rivera also denied traveling with the Explorer or knowing its occupants. On cross examination, Rivera insisted that she could still recall that the vehicle was a green Ford Explorer with Missouri tags, even though she claimed to have no connection with that vehicle.

Rivera further testified that Trooper Rule did not follow her for any length of time; that after he drove beside the Honda, he dropped back and immediately pulled in between her and a van that was behind her vehicle. Rivera testified that she did not stray onto the shoulder at all; and that Rule could not have seen her doing this. Having seen Rule and Rivera testifying, having watched their demeanor, and considering the credibility of their tes-

---

The patrol car was also equipped with a microphone to record radio traffic; and Rule had a body microphone as well.

timony in light of the other evidence, the Court believes Rule's account of what happened.

**Discussion**

█ A traffic stop is valid under the Fourth Amendment if the officer has observed a traffic violation, or if the officer has a "reasonable articulable suspicion" that a traffic violation has occurred or is occurring.[4] Failing to maintain a single lane is a violation of the Kansas statute[5] that requires that a vehicle be "driven as nearly as practicable entirely within a single lane." This statute does not make straying from a lane a per se violation, but requires that a car be driven "as nearly as practicable" within a single lane. Thus, for a practical and legitimate reason, one can stray from a lane without violating the statute. For example, as Trooper Rule testified, one can change lanes of traffic; but Kansas law requires one to signal their lane change.

Because this statute has an element of practicability, the Court must necessarily consider the circumstances that might explain the vehicle's straying from the lane. In *United States v. Gregory*,[6] the Tenth Circuit held that one incidence of a U-Haul truck straying onto the shoulder of the road did not establish probable cause

or reasonable suspicion that the Utah single lane statute had been violated, because the road was winding, the terrain mountainous, and the weather windy. Thus,

> Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity. The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane. Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision.[7]

But, in *United States v. Dunn*,[8] a stop based on a single incidence of a sedan straying onto the shoulder was valid, where the road was straight and slightly graded, and it was not windy. In other words, there was no apparent reason for the car straying from its driving lane.

When the officer observes a vehicle straying from the lane more than once, over a period of time or distance, the need to consider other facts is not as great, for repeated straying is stronger evidence that the driver's straying from the lane is not due to external circumstances, and that staying in the lane was not impracticable. Thus, in *United States v. Ozbirn*,[9] the

---

4. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (stating that a traffic stop is reasonable "where the police have probable cause to believe that a traffic violation has occurred."); *U.S. v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (citing *United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995)) (reasonable articulable suspicion of traffic violation is valid basis for traffic stop).

5. K.S.A. § 8–1522.

6. 79 F.3d 973, 977 (10th Cir.1996) (analyzing Utah Code Ann. § 41–6–61(1) which requires that vehicles operate "as nearly as practical entirely within a single lane"); *See also United States v. Ochoa*, 4 F.Supp.2d 1007, 1011–

12 (D.Kan.1998) (traffic stop was not justified because the vehicle had strayed onto the shoulder only once, there was no evidence concerning the weather or road conditions, inconsistent evidence concerning the traffic conditions, as well as evidence that the positioning of the trooper's car may have caused the driver to stray onto the shoulder).

7. *Gregory*, 79 F.3d at 978.

8. 133 F.3d 933, 1998 WL 8227 (10th Cir. 1998) (analyzing K.S.A. 8–1522 which requires that a vehicle "be driven as nearly as practicable entirely within a single lane").

9. 189 F.3d 1194, 1198 (10th Cir.1999).

Tenth Circuit held a stop valid when the trooper had observed the vehicle twice drifting onto the shoulder of the road within a quarter mile stretch, at a time when there were optimal road, weather, and traffic conditions, that did not make staying in one lane impracticable.[10] In *United States v. Parker,*[11] the stop was valid where the trooper observed the car drift twice into the emergency lane for approximately 200 feet. In *United States v. Phillips,*[12] the stop was valid when the vehicle twice crossed the line and was also traveling well below the maximum authorized speed. And, in *United States v. Botero–Ospina,*[13] the stop was valid where the officer observed the car "swerve from the outside lane, straddle the center line, and swerve back to the outside lane." In each instance, the officer's observations of repeated straying supported a reasonable suspicion that it was not impracticable for the car to have stayed in one lane.

Here, Rivera strayed onto the shoulder twice, within a short distance and within ten seconds or less. Each time she weaved back fully into the lane after straying partially onto the shoulder for a couple of seconds. She was driving a low profile car and the road and weather conditions should not have affected her ability to keep the car in a single lane. Nothing suggests that the presence of Trooper Rule's car affected her ability to stay in one lane

either. His car was behind her car. In short, Rule had a reasonable articulable suspicion to stop her. He suspected that she was sleepy or impaired because of her straying onto the shoulder twice, when there appeared to be no external explanation for this action.

▮ Rivera also challenges Trooper Rule's continued detention of her after he determined that her driver's license was valid and returned the license and rental agreement to her. Although the initial stop of Rivera's vehicle was legitimate, any further detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry.*[14] "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.' "[15] It must be temporary, and its scope must be carefully tailored to its underlying justification.[16] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[17]

A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[18] After Rule de-

---

**10.** *Id.*

**11.** 72 F.3d 1444 (10th Cir.1995).

**12.** 1 Fed. Appx. 847, 849, 2001 WL 15533 (10th Cir.2001).

**13.** 71 F.3d 783, 785 (10th Cir.1995) (en banc), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996).

**14.** 392 U.S. at 20, 88 S.Ct. 1868.

**15.** *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Roy-*

*er,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

**16.** *United States v. Gutierrez–Daniez,* 131 F.3d 939, 942 (10th Cir.1997), *cert. denied,* 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998) (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997)).

**17.** *Patten,* 183 F.3d at 1193 (citation omitted); *United States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir.1997) (citations omitted).

**18.** *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir.1998) (citations omitted).

termined that Rivera had a valid driver's license and after he decided to issue a warning citation, a further detention had to be supported by a reasonable and articulable suspicion, unless the encounter became consensual. Rule testified that at this point in the traffic stop, he suspected that illegal activity might be involved, because Rivera was driving a rental vehicle, commonly used by those transporting drugs. Further, Rivera displayed extreme nervousness, with shaky hands and voice; and she made little eye contact with Rule during their conversation. Also, Rivera's account of her travel plans was not consistent with the rental agreement. Finally, Rule knew that cars transporting drugs sometimes travel with "escort" vehicles. Rule knew that Rivera resided in Easton Pennsylvania, according to her driver's license; and that the red Honda was registered to a man residing in Easton Pennsylvania.

But the Court need not decide whether Rule had a reasonable and articulable suspicion justifying further detention. If an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[19] After Rule returned to the vehicle, the encounter became consensual. Rule returned all documentation to Rivera, and began to walk away. Rivera stopped Rule, asking a question of him. He answered, then again stepped away from the vehicle. At this point Rule asked for permission to ask Rivera questions and Rivera agreed.[20] Merely asking questions does not constitute a seizure or implicate the Fourth Amendment.[21]

Rivera not only agreed to answer Rule's questions; when Rule asked for permission to search the vehicle, Rivera responded affirmatively and released the trunk lock from inside the vehicle so that Rule could have access. Rivera contends that her consent was not voluntarily given. Although consent must be given voluntarily, there is no requirement that it be given knowingly and intelligently; and there is no requirement that the consenting party knows they have the right to refuse consent.

In *Schneckloth v. Bustamonte,*[22] the Supreme Court noted that in determining voluntariness, courts should look to the totality of circumstances, including the age, education, experience, intelligence, and knowledge of the right to withhold consent, as well as whether the consenting party was advised of his or her constitutional right. The court should also consider whether officers gained permission to search by coercive means or under inherently coercive circumstances. Voluntariness is a question of fact to be determined by the totality of the circumstances.[23] The government bears the burden of proving voluntary consent and must meet two standards: "the government must (1) 'proffer

---

**19.** *See United States v. Davis,* 94 F.3d 1465, 1468 (10th Cir.1996); *Patten,* 183 F.3d at 1194 ("A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official.") (quotation omitted).

**20.** A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver, unless the officer has a reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning. *See United States v. Hernandez,* 93 F.3d 1493, 1498 (10th Cir.1996); *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir.1999).

**21.** *Royer,* 460 U.S. at 497, 103 S.Ct. 1319.

**22.** 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**23.** *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

clear and positive testimony that consent was unequivocal and specific and freely and intelligently given' and (2) 'prove that this consent was given without implied or express duress or coercion.' "[24]

In this case, there is no evidence suggesting that Rivera was equivocal, hesitant or unwilling to give consent. When Rule first stepped away from the vehicle, Rivera asked him a question, thus prolonging the encounter. And, there is no evidence that Rule employed coercive means to obtain Rivera's consent to search. From the Court's observations of the video taped encounter, Rule was at all times soft spoken, pleasant, respectful and low key. There were no harsh words, no show of force, or anything other than positive, and cooperative interaction between Rule and Rivera. Rule was the only trooper present during the stop; the encounter occurred on a highway with moderate traffic and in public view. Although Rule leaned toward the car window, this was because he was on the passenger side of the car and needed to do so to see and speak to Rivera who was in the driver's seat. Rule did not display or brandish his weapon and did not touch Rivera.

Nor is there any evidence that Rivera withdrew her consent during the course of the search, or limited the scope of Rule's search, by either word or deed.[25] Rivera watched Rule's search. She was able to see Rule search through the trunk, including the suitcases. Rivera never objected, protested or indicated that she wanted Rule to stop searching or to stay out of the suitcases. And, although Rule had motioned for Rivera to stand in the front of the car, instead she stood on the side of the car, at which vantage point she watched the entire search. Obviously Rivera did not feel that she had been ordered to stand in a particular spot. She was free to move beside the car. Thus, nothing suggests that the encounter did not remain consensual.

Based on the totality of the circumstances, the Court finds that Rivera consented to answering Rule's questions, consented to Rule searching the vehicle, trunk, suitcases and all. For these reasons, the Court concludes that Rivera's motion to suppress evidence has no legal basis and should be denied as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Rivera's Motion to Suppress (Doc. 28) is DENIED.

---

**24.** *United States v. Hernandez*, 944 F.Supp. 847, 851 (D.Kan.1996) (*citing United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996)) (quotation omitted).

**25.** *See U.S. v. Lewis*, 24 F.3d 79, 81 (10th Cir.1994), *cert. denied* 513 U.S. 905, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994) (finding consent to search passenger's luggage in trunk when driver's consent was "framed in general terms (extending to the entire trunk and its contents)," the officer had no way to determine who owned the luggage, and the passenger did not interpose any contemporaneous objection to the search of his bag); *United States v. McRae*, 81 F.3d 1528, 1537–38 (10th Cir.1996) (a defendant's consent to search the car and trunk included lifting up carpeting in the trunk of the car); *See also United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir.1990), *cert. denied* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991) (where defendant consented to officer's request to "look" in his car and then walked away and did not object as officer began to remove panel from car, search was conducted within general scope of consent); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir.1986) (where defendant consented generally to search of car and then stood by while officer searched trunk, under seats, under carpet, in luggage, in glove box, and under left rear panel of car, officer's search of left rear panel was within scope of consent).